**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

JANEEN KUCZERO,                          )
                                         )
         Plaintiff,                      )
                                         )
    v.                                   )        Case No. 2:21-cv-246-JPK
KILOLO KIJAKAZI, Acting Commissioner     )
of Social Security,                      )
                                         )
         Defendant.                      )

## OPINION AND ORDER

Plaintiff Janeen Kuczero filed the present complaint seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her Title II application for Disability Insurance Benefits ("DIB"). *See* 42 U.S.C. § 405(g). The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. *See* [DE 9]. Accordingly, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c). After carefully considering the Administrative Record[1] and the parties' briefs, the Court now reverses the Commissioner's decision and remands for further proceedings.

## BACKGROUND

### A.    OVERVIEW

Plaintiff filed a Title II application for a period of disability and disability insurance benefits on November 28, 2018, in which she alleged disability beginning September 14, 2018. She was 47 years old when she filed the application. Plaintiff has a college degree in finance

---

[1] The Administrative Record [AR] is found in Docket Entry # 12. The page citations in this opinion are to the Bates stamp numbers in the lower right corner of each page.

administration, and her most recent job was working for a corporation as a software support specialist. Plaintiff's disability application alleged that she was unable to work due to Meniere's Disease, chronic migraines, pseudo tumor cerebri syndrome, Hashimoto Thyroiditis, fibromyalgia, anxiety and depression, memory, focus and concentration problems, tinnitus in the left ear, sit/stand/walk/lift limitations, problems sleeping at night/fatigue during day, and pain in head and neck.

Plaintiff's application was denied at the agency level initially on April 12, 2019, and upon reconsideration on August 14, 2019. Thereafter, Plaintiff filed a written request for a hearing before an administrative law judge (ALJ), which was held on May 14, 2020. Following the hearing, the ALJ elected to send out interrogatories to an impartial medical expert, and a supplemental hearing was held on October 20, 2020. The ALJ issued an unfavorable decision on Plaintiff's application on March 2, 2021. Plaintiff filed a request for review by the Social Security Administration (SSA) Appeals Council, which was denied on July 1, 2021. This appeal followed.

B.     THE FIVE-STEP EVALUATIVE PROCESS

To be eligible for Social Security disability benefits, a claimant must establish that she suffers from a "disability," which is defined as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The ALJ follows a five-step inquiry to determine whether the claimant is disabled. The claimant bears the burden of proving steps one through four, whereas the burden of proof at step five is on the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

At the first step, the ALJ asks whether the claimant has engaged in substantial gainful activity during the claimed period of disability. An affirmative answer at step one results in a

2

finding that the claimant is not disabled and the inquiry ends. If the answer is no, the ALJ moves on to the second step, where the ALJ identifies the claimant's physical or mental impairments, or combination thereof, that are severe. If there are no severe impairments, the claimant is not disabled. If there are, the ALJ determines at the third step whether those severe impairments meet or medically equal the criteria of any presumptively disabling impairment listed in the regulations. An affirmative answer at step three results in a finding of disability and the inquiry ends. Otherwise, the ALJ goes on to determine the claimant's residual functional capacity (RFC), which is "an administrative assessment of what work-related activities an individual can perform despite his limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). At the fourth step of the inquiry, the ALJ determines whether the claimant is able to perform past relevant work given the claimant's RFC. If the claimant is unable to perform past relevant work, the ALJ determines, at the fifth and final step, whether the claimant is able to perform any work in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). A positive answer at step five results in a finding that the claimant is not disabled while a negative answer results in a finding of disability. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); 20 C.F.R. § 404.1520(a)(4).

    **C.**    **THE ALJ'S DECISION**

The ALJ made the following findings relevant to Plaintiff's disability application:[2]

       1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

       2.     The claimant has not engaged in substantial gainful activity since September 14, 2018, the alleged onset date.

       3.     The claimant has the following severe impairments: Meniere's disease, headaches, sensory neural hearing loss,

---

[2] The paragraphs listed herein correspond with the paragraphs in the ALJ's decision.

fibromyalgia, cervical degenerative disc disease, anxiety, and depression. She has the non-severe impairments of pseudo tremor cerebri syndrome and Hashimoto Thyroiditis.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except: she is limited to no more than 20 minutes of standing or walking at one time; she can frequently operate hand controls with the bilateral upper extremities, but can only occasionally operate foot controls with the bilateral feet; she can never climb ladders, ropes, or scaffolds, and can never balance, but can occasionally climb ramps and stairs, and frequently stoop, crouch, kneel, and crawl; she can have only occasional overhead reaching with the bilateral upper extremities, but can have frequently reaching in all other directions; she can tolerate occasional exposure to extreme cold, extreme heat, wetness, and humidity, occasional exposure to vibration, occasional exposure to pulmonary irritants such as fumes, noxious odors, dust, mists, gases, and poorly ventilated areas; she can never be exposed to hazards such as moving mechanical parts or unprotected heights; she cannot perform driving of motor vehicles while at work; she is limited to a noise intensity level no greater than moderate per the SCO; and she is able to understand, remember, and carry out work that consists of detailed, but not complex tasks (to include SVP 3 and 4 jobs as defined by the DOT and SCO).

6. The claimant is unable to perform past relevant work.

7-9. The claimant was a younger individual, age 45-49, on the alleged disability onset date, has at least a high school education, and has acquired work skills from past relevant work, with a specific vocational preparation (SVP) code of 7 with the following skills: customer service, obtaining and relaying information, and clerical work.

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy, including information clerk, receptionist, and telephone clerk.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 14, 2018, through the date of this decision.

[AR 15-24].

**D.    RECORD EVIDENCE**

Plaintiff's medical records document a long history of chronic and often debilitating health issues stemming from multiple medical conditions.

**1.    MEDICAL TREATMENT THROUGH 2017**

**a.    MENIERE'S DISEASE**

"Meniere's disease is an inner-ear condition 'characterized clinically by vertigo[3], nausea, vomiting, tinnitus[4], and progressive hearing loss due to hydrops of the lymphatic duct.'" *Kruppenbacher v. Astrue*, No. 04 CIV. 4150 WHP HBP, 2010 WL 5779484, at *1 n.2 (S.D.N.Y. Apr. 16, 2010) (quoting *Stedman's Medical Dictionary* (27th ed. 2000)), *report and recommendation adopted*, No. 04 CIV. 4150 WHP, 2011 WL 519439 (S.D.N.Y. Feb. 14, 2011).[5] Standard treatment options to control Meniere's symptoms include non-ablative options that spare

---

[3] Vertigo refers to a kind of dizziness that creates the false sense that the person's surroundings are spinning or moving. *https://www.mayoclinic.org/diseases-conditions/dizziness/symptoms-causes/syc-20371787* (last visited September 25, 2022).

[4] Tinnitus is commonly described as a ringing in the ears, but it also can sound like roaring, clicking, hissing, or buzzing. *See https://www.nidcd.nih.gov/health/tinnitus* (last visited September 25, 2022).

[5] *See also https://www.webmd.com/brain/what-is-meniere-disease* (last visited September 25, 2022).

the vestibular function,[6] and ablative options that result in loss of vestibular function in the treated ear and may lead to problems with chronic imbalance and more hearing loss.[7]

Plaintiff was diagnosed with Meniere's disease in the left ear in 2000 after experiencing ringing in her ears, dizziness, and migraine headaches. To treat these symptoms, she had endolymphatic sac decompression surgery, performed by Dr. Stephen Henson, an otolaryngologist[8] in Lafayette, Indiana. The procedure was successful at treating her symptoms for about thirteen years. Beginning in 2012, however, Plaintiff repeatedly sought treatment at an immediate care center for dizziness. On May 9, 2013, Plaintiff's treating specialist, an otolaryngologist in Indianapolis named Dr. Michael H. Fritsch, wrote a letter to Plaintiff's local otolaryngologist in Lafayette, explaining that the endolymphatic mastoid shunt surgery Plaintiff had undergone many years ago had failed, likely due to scar tissue or blockage from proteinaceous material. As a result, Plaintiff was having roaring and hearing loss in the left ear, as well as episodic vertigo that was described as "disabling." Accordingly, Dr. Fritsch performed a second shunt procedure on Plaintiff's left ear on July 18, 2013.

Following the second shunt procedure, Plaintiff did well until about March 2014, when her symptoms returned. She reported a sudden increase in left-sided tinnitus as well as a drop in her hearing. She also started having true rotational vertigo episodes approximately every other month,

---

[6] These treatment options include a low salt diet, diuretics, intratympanic steroid injections, and endolymphatic sac (shunt) surgery. *See https://www.mountsinai.org/locations/center-hearing-balance/conditions/vertigo-balance-disorders/menieres-disease* (last visited September 28, 2022).

[7] These treatment options include intratympanic gentamicin, labyrinthectomy, and vestibular nerve section. *See https://stanfordhealthcare.org/medical-conditions/ear-nose-and-throat/menieres-disease/treatments.html* (last visited September 28, 2022).

[8] An otorhinolaryngologist is a doctor who specializes in the surgical and medical management of conditions of the head and neck, also referred to more simply as a head and neck or ENT surgeon.

and noticed that stress could be a significant trigger. Plaintiff was seen for an evaluation in June 2014, at which time an audiogram test confirmed unilateral hearing loss for the left ear. [AR 734].

In September 2014, Plaintiff started having a loud, constant tinnitus in the left ear. The tinnitus seemed to improve with antianxiety drugs and steroid administration. Dr. Fritsch reported that these new symptoms were a "reactivation of her left Meniere's disease in the cochlear component," which was a "somewhat unusual finding." Dr. Fritsch ordered an MRI scan of the internal auditory canals and cochlea, and described various other treatments he intended to pursue. On December 3, 2014, Plaintiff complained of increased symptoms from her Meniere's disease, which Dr. Fritsch treated with steroid injections. He believed Plaintiff's symptoms were a "temporary 'flare-up' of the Meniere's" but if an increase in medication did not improve the situation, she would need another shunt procedure.

Between November 2014 and February 2015, Plaintiff received approximately seven perfusions in the left ear. [AR 1373]. In March 2015, Plaintiff reported the injections had helped with the symptoms initially but were no longer working and she was experiencing constant ringing in her ear. [AR 678]. On April 27, 2015, Plaintiff described her past history of vertigo, dizziness, and ataxia[9] to her new treating otolaryngologist in Indianapolis, Dr. Vincent Ostrowski. She reported experiencing recurrent episodes of dizziness lasting four or more hours, with the most current episode occurring on April 10, 2015. She also reported hearing loss, a feeling of pressure in her left ear, fullness, a popping noise, and tinnitus on the left side. [AR 1373]. Plaintiff perceived no lasting benefit from the steroid injections she had been receiving since November 2014, and she continued to complain about increased episodes of vertigo, including true rotational vertigo

---

[9] Ataxia means "without coordination," and refers to a movement disorder caused by problems in the brain leading to difficulties in controlling movements in arm and leg muscles. *https://www.webmd.com/brain/ataxia-types-brain-and-nervous-system* (last visited September 22, 2022).

with nausea and vomiting, associated feelings of fullness, pressure, and tinnitus in the left ear, as well as fluctuant loss of left-sided hearing. [AR 1368, 1366, 1364, 1359]. Results from vestibular testing, however, revealed normal thresholds for balance testing with ENG, VEMP, and Electocochleography. [AR 1371].[10]

In appointments on May 8, 2015, June 19, 2015, August 21, 2015, and November 19, 2015, Dr. Ostrowski performed a series of Gentamicin perfusions on Plaintiff's left ear.[11] [AR 1368, 1362]. Plaintiff's vertigo seemed to improve for some time after that. But on January 6, 2017, Plaintiff complained to Dr. Ostrowski about recurring episodes of true vertigo four times in the last two weeks. [AR 418]. She described these episodes as severe and intense. An ENT examination showed asymmetrical sensorineural hearing loss in the left ear, as well as migraine associated disequilibrium from Meniere's disease. [AR 419]. Due to the persistent and disabling nature of Plaintiff's symptoms from intractable Meniere's disease, following previous more conservative treatment options without permanent relief, Plaintiff underwent a vestibular neurectomy of the left ear on April 12, 2017, in which the superior vestibular nerve was completely cut.[12] [AR 410, 427-428; AR 638-639, 1388-1389].

---

[10] A normal vestibular test means there are no signs of vestibular dysfunction as a cause for a person's reported inner ear symptoms. There are different types of vestibular tests, including gvideonystagmography (VNG), rotary chair, modified clinical test of sensory interaction on balance (mCTSIB), video head impulse test (VHIT), vestibular evoked myogentic potentials (VEMP), dynamic visual acuity testing (DVA), and risk of falls assessments *See https://my.clevelandclinic.org/health/diagnostics/21518-vestibular-test-battery* (last visited September 25, 2022).

[11] Injections of gentamicin are given through the ear drum to deaden the inner ear (destroy the nerve causing the vertigo), usually as a last resort treatment for Meniere's patients who have severe attacks of vertigo. "Disability is lessened in patients with Menieres after [ ] treatment," but "[d]izziness may reoccur one year later, requiring another series of injections." *https://dizziness-and-balance.com/treatment/ttg.html* (last visited September 25, 2022).

[12] Vestibular neurectomy works to relieve vertigo by cutting off the part of the auditory nerve that helps maintain balance, preventing the brain from receiving signals that trigger a vertigo attack,

At a follow-up appointment on May 3, 2017, Plaintiff reported no episodes of vertigo since the surgery as well as marked improvement in tinnitus and hearing, but she did experience persistent unsteadiness. Dr. Ostrowski recommended vestibular rehabilitation training for further balance improvement. [AR 414-416; *see also* AR 1353-1354]. On May 15, 2017, Plaintiff reported that she had a severe bout of dizziness that she believed was related in part to an inner ear infection. [AR 423]. Plaintiff tested positive for head thrust to the left and had difficulty with faster head movements. Her impairments or limitations included ambulation, balance, coordination/perception, mobility, transfer, visual perception, and vestibular deficits. Plaintiff started rehabilitative physical therapy on May 17, 2017 for balance training, coordination training, facilitation of gross motor skills, and gait training to decrease her dizziness. [AR 425, 1386]. It appears that Plaintiff did not see Dr. Ostrowski again until the following year. At that time, she reported that her symptoms of vertigo were markedly improved since the surgery on April 12, 2017, that she had had no nausea or vomiting in the past year, and that her hearing was also somewhat improved. An ENT examination was grossly normal and an audiogram revealed mild to moderate hearing loss. [AR 410-412].

### b.    MIGRAINES, FIBROMYALGIA, ETC.

Plaintiff started having headaches around age 26. She reported that she was in so much pain when she first got them that she "thought she would die." [AR 672]. Her symptoms included nausea, throbbing, pain, and light sensitivity. A few years after her migraines first began, Plaintiff was diagnosed with fibromyalgia. [AR 550]. "The principal symptoms of fibromyalgia are 'pain

---

while preserving the nerve that allows for hearing. It can initially affect the ability of the ear to regulate balance, although the brain usually is able to adjust over time using just one ear for balance. *See https://www.medicinenet.com/what_is_a_ vestibular_neurectomy/article.htm* (last visited September 25, 2022).

all over,' fatigue, disturbed sleep, [and] stiffness." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).[13] "[T]he only symptom that discriminates between it and other diseases of a rheumatic character" is "multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." *Id.* (internal citations omitted). It does not appear to be in dispute that Plaintiff satisfies the tender-point test described above [AR 70], although the ALJ did not discuss that evidence in her decision. Plaintiff's symptoms from her fibromyalgia include widespread pain and generalized fatigue, for which she has occasionally had to seek emergency treatment with pain rated sometimes as high as an 8 out of 10 even after taking prescriptions medications. [AR 487-488, 550].

Plaintiff has also been diagnosed with idiopathic intracranial hypertension (IIH) or pseudo tumor cerebri syndrome, a condition that occurs when pressure inside the skull increases for no obvious reason, often causing any number of symptoms including severe headaches, a whooshing sound in the head, nausea, vomiting, dizziness, vision loss, brief episodes of blindness, double vision, seeing light flashes, and neck, shoulder or back pain.[14]

Another long-standing diagnosis Plaintiff has is Hashimoto Thyroiditis, an autoimmune disorder that can cause hypothyroidism or underactive thyroid,[15] including "myxedema," which is

---

[13] *See also https://www.cdc.gov/arthritis/basics/fibromyalgia.htm* (last visited September 25, 2022) (the most common symptoms of fibromyalgia are pain and stiffness all over the body, fatigue and tiredness, depression and anxiety, sleep problems, problems with thinking, memory, and concentration, and headaches, including migraines, and other symptoms may include tingling or numbness in hands and feet, pain in the face or jaw, and digestive problems).

[14] *See https://www.mayoclinic.org/ diseases-conditions/pseudotumor-cerebri/symptoms-causes /syc-20354031* (last visited September 25, 2022).

[15] *See https://www.niddk.nih.gov/health-information/endocrine-diseases/hashimotos-disease* (last visited September 25, 2022).

a term for severely advanced hypothyroidism.[16] Hypothyroidism can manifest in terms of varied symptoms, including fatigue, increased sensitivity to cold, muscle weakness, aches, tenderness or stiffness, joint pain, stiffness or swelling, depression, and impaired memory.[17]

Because these conditions caused Plaintiff severe pain, which was often unresponsive to either over-the-counter or prescription medications, Plaintiff frequently had to go to an immediate care center or the emergency room for treatment of an acute event.[18] She usually took Fioricet[19] and Lortab[20] for both fibromyalgia and headaches, but those medications oftentimes did not resolve her pain. Around July 2014, Plaintiff was referred to a pain management nurse practitioner who started her on a trial of opiate therapy (Tramadol), and also prescribed Topamax, a nerve pain medication. In a follow-up appointment on September 3, 2014, Plaintiff reported a decrease in the severity of her headaches from use of the prescribed medications, and it was noted that, without the medications, she would not be able to perform many activities of daily living. [AR 706; *see also* AR 664 (treatment for intractable chronic migraine)]. On January 7, 2015, Plaintiff was seen for throbbing headache pain in the right frontal area. She reported waking up with the pain and

---

[16] *See https://www.healthline.com/health/ myxedema* (last visited September 25, 2022); [AR 737 (medical records from 2012-2013 showing treatment for myxedema)].

[17] *See https://www.mayoclinic.org/diseases-conditions/hypothyroidism/symptoms-causes/syc-20350284* (last visited September 22, 2022).

[18] *See* [AR 1095, 1235, 1297-1300, 1306, 1441].

[19] Fioricet is a combination of acetaminophen and caffeine used to treat tension headaches. *https://www.webmd.com/drugs/2/drug-15869/fioricet-oral/details* (last visited September 25, 2022).

[20] Lortab is a combination of acetaminophen and an opioid pain medication (hydrocodone) used to treat moderate to severe pain. *https://www.drugs.com/lortab.html* (last visited September 25, 2022).

taking Fioricet without any relief. Plaintiff's pain was treated with a Ketorolac[21] injection. [AR 690-691].

Plaintiff's headaches and fibromyalgia pain seemed to be mostly under control for the remainder of 2015. She reported that she felt the Topamax worked for her fibromyalgia pain but did not help with the headaches. She also said that she felt the Topamax affected her memory and was "making her 'stupid'" and that she usually took Tramadol once to twice a day for her migraines. Plaintiff's neurologist, Dr. Du, prescribed Propranolol (inderal)[22] daily. [AR 673-677].

Plaintiff continued to receive treatment for fibromyalgia flare-ups and migraines throughout 2016. Plaintiff reported that the inderal helped with her migraines but that she still needed rescue medications 3 to 5 times a months. In June 2016, she reported a flare up of her fibromyalgia that kept her in bed for three days. In October 2016, Plaintiff reported to a pain management specialist that she wanted to go off Topamax because she did not like its cognitive effects. On December 6, 2016, Plaintiff reported to Dr. Du that she was in urgent care the previous week for her migraines, and asked about scheduling infusions of Keppra,[23] which had helped in the past. *See* [AR 650-651, 645, 657-658, 664-665, 669-670].

---

[21] Ketorolac (Toradol) is a nonsteroidal anti-inflammatory drug used for the short-term treatment of moderate to severe pain, usually before or after medical procedures or after surgery. *https://www.webmd.com/drugs/2/drug-3919/ketorolac-oral/details* (last visited September 22, 2022).

[22] Inderal is a beta blocker used to treat high blood pressure and other conditions. It is also used to prevent migraine headaches. *https://www.webmd.com/drugs/2/drug-6840/inderal-oral/details* (last visited September 22, 2022).

[23] Keppra (levetiracetam) is an antiepileptic drug that is sometimes prescribed as a prophylactic treatment for migraines with aura with high frequency of attacks. *https://pubmed.ncbi. nlm.nih.gov/17095897/* (last visited September 22, 2022).

In 2017, Plaintiff reported that Topamax was no longer helping and she needed rescue medications 3 to 5 times a month, and that she was having more headaches after the vestibular neurectomy in April 2017. Dr. Du added Botox to Plaintiff's pain regimen, but Plaintiff later reported it did not help with her headaches. The Keppra had also stopped working and Plaintiff asked about getting ketamine (Toradol) infusions,[24] which she had received in the past at urgent care. [AR 550, 629, 635-636].

On September 13, 2017, Plaintiff had an appointment with Dr. Edward Kowlowitz, at the Lafayette Center for Pain Management. She complained of fibromyalgia pain "located in the left occipital area, left side of the neck, left upper extremity, right occipital area, right shoulder, and right lower extremity, with associated symptoms of nausea and dizziness (tinnitus). She described the pain as throbbing, with symptoms occurring frequently, and reported daily episodes of moderate severity, which had been worsening over time. Her symptoms were exacerbated by stress, lights and loud noises, and were relieved by rest and meditation. A Review of Systems showed positive reports for, among other things, blurred vision, hearing loss, ringing in ears, vertigo, neck stiffness, chest pain, swelling in extremities, nausea, vomiting, joint pain, stiffness and swelling, muscle weakness, decreased memory, dizziness, headaches, unsteadiness, anxiety, and depression. Dr. Kowlowitz assessed Plaintiff with spondylosis of the cervical region[25] and ordered an MRI. The MRI showed a protrusion abnormality, including small right posterolateral

---

[24] Ketamine infusions are used to treat various chronic pain syndromes, especially those that have a neuropathic component. While most studies show that short term ketamine infusion is indeed associated with pain relief during infusion, only a few studies examined the prolonged effect of ketamine following infusion. *See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4014022/* (last visited September 22, 2022).

[25] Spondylolysis is a weakness at the point at which the vertebrae of the spine connect together. *https://my.clevelandclinic.org/health/diseases/22564-radiculopathy#diagnosis-and-tests* (last visited September 22, 2022).

protrusions at C2-3 and C3-4, and circumferential bulging at C5-6. Dr. Kowlowitz subsequently prescribed nerve blocks for spine tenderness. [AR 549-553, 561-562, 628].

After treatment with the nerve blocks in the fall of 2017, Plaintiff reported more than 80 percent pain relief. But the blocked pain subsequently returned. Dr. Fitzgerald at the Lafayette Center for Pain Management recommended a radio frequency ablation (RFA) procedure for each of six different joints every six months. [AR 545-547]. While receiving these treatments over the following months, Plaintiff continued at various times to seek pain relief at the immediate care center for migraines, fibromyalgia flare-ups, neck pain, and dizziness.[26] The same pattern continued into the first part of 2018.[27]

### 2.    MEDICAL TREATMENT FROM 2018 THROUGH 2020

On April 18, 2018, Plaintiff presented to a follow-up appointment with Dr. Kowlowitz complaining of neck pain. Dr. Kowlowitz recommended five days of ketamine infusions, which Plaintiff received between April 30, 2018 and May 4, 2018. Plaintiff reported complete pain relief from the infusions that lasted two to four weeks. On June 6, 2018, Plaintiff saw Dr. Kowlowitz for increased migraines that had returned after she suffered from an ear infection, and thereafter underwent additional ketamine injections. At an appointment with the neurology nurse practitioner that month, Plaintiff reported that the ketamine infusions had resulted in two weeks without any headaches. [AR 538-539, 541, 607, 1026]. Nevertheless, Plaintiff sought relief from migraine pain by going to the Unity Immediate Care Center numerous times from June 4, 2018 to November 6,

---

[26] [AR 548, 1116, 1113, 1121].

[27] [AR 542, 1107, AR 410, 1350 (noting improvement with pain from the nerve block injections she had been receiving from Drs. Kowlowitz and Fitzgerald); AR 612, 624, 1104, 1107, 1110, 1101, 1098 (treatment at the immediate care center for migraine pain, dizziness, and other pain issues)].

2018 where she received additional injections and IV medications.[28] On one of those dates in July 2018 Plaintiff reported that the medications she took to treat acute migraine pain only gave her about six hours of relief, and that she believed her headaches were precipitated either by loud noise, which exacerbated her Meniere's disease, or heat, which exacerbated her fibromyalgia. Plaintiff talked about being depressed and feeling like nothing would control her pain, and that it would just keep coming back no matter what medication she took. She reported that she sometimes wished she would not wake up in the morning and that she is disappointed when she does. The nurse practitioner prescribed Zomig nasal spray as a new medication to try. [AR 607-608].

Also in July 2018, Plaintiff checked herself into a mental health treatment facility because of severe emotional distress from relationship difficulties, which led her to contemplate suicide.[29] Plaintiff completed a three-week in-house program and was not suicidal after that, although she continued to have passive suicidal thoughts such as wishing she would not wake up. [AR 573-575]. Her therapy records show that both during her in-house treatment and in sessions that continued once she completed the program, a large part of Plaintiff's continuing anxiety and depression stemmed from her health issues.[30]

---

[28] [AR 493-495, 514, 1081, 1082, 1083, 1084, 1087, 1089, 1090, 1091, 1092, 1093, 1094, 1095, 1096, 1098, 1099].

[29] Plaintiff has struggled with depression on and off since the age of 26. [AR 437]. She was treated for depression and anxiety, especially stemming from her physical impairments, in 2014-2015. [AR 669, 1392-1393].

[30] *See, e.g.,* [AR 573 (anxiety about driving since an episode of extreme dizziness and disorientation due to Meniere's disease and fear that symptoms may come back at any time); AR 469 (she is tired of chronic medical conditions); AR 430 (she expressed concerned about losing her job and stated she is "sick of being sick," and is dreading talking to her boss about needing more time off; her anxiety is an 8 (out of 10) and her affect is flat and anxious); AR 573 (she expressed feelings of being overwhelmed by medical issues and pain (and related functional difficulties), and said she "does not feel like a productive worker due to her medical difficulties" and was "dreading her return to work"); AR 575 (she has had to rely on FLMA leave in the past and is unsure if she can continue working, primarily due to debilitating effects of her

For the remainder of the summer 2018, it appeared that Plaintiff was coping with migraines with the combined treatments for migraine prevention and immediate relief consisting of Zomig, Fioricet, Cymbalta, and verapamil. [AR 535-527, 1021]. However, Plaintiff did not like using Zomig, which she said was effective for acute migraines but had significant side effects including burning in the throat and muscle tightness and pains in the arms and legs. [AR 1021]. The neurology nurse practitioner switched Plaintiff's prescription from Zomig to frovatriptan. In August 2018, Plaintiff reported an episode of vision loss in the right eye, where her eyesight went "completely black" along with a pressure headache. The neurology nurse practitioner attributed the episode to IIH, noting that Plaintiff's 2013 MRI brain "showed possible papilledema." [AR 1018]. Plaintiff was prescribed acetazolamide[31] to reduce the amount of fluid in the eye as well as fluid build-up in the body, such as what occurs with IIH. [AR 1015, 1019].

---

hypothyroidism (fatigue), Meniere's disease (extreme dizzy spells), fibromyalgia, and migraines; she is extremely conflicted about applying for disability, but her medical issues are interfering with her ability to work; she relies heavily on medications for coping and is constantly having to advocate for herself in various medical systems); AR 580 (blames herself for struggling with concentration, motivation, and energy, particularly at work; struggles with wanting to be "normal" and wanting one diagnosis that would explain her myriad medical conditions; worries that it is all "in her head"); AR 586 (conflicted over wanting to work and feelings of not being "useful" if she stops working due to medical conditions); AR 1453 (she struggles with depression, much of it related to her medical/physical conditions and the limitations they have placed on her life, losing her ability to work because of her health, and struggling to function uninterrupted day-to-day because of her health problems; she feels she must rely on others and experiences a sense of loss of control as a result); AR 1448-1449 (notes feeling hopeless and impairment in concentration, persistence and pace); AR 1454 (experiences period of times where she does not want to be alive due to physical pain from medical issues; feels betrayed by her body); AR 1548 (reports difficulties with focus and concentration, depression is a 7 out of 10 and anxiety is an 8 out of 10)].

[31] Acetazolamide is also often prescribed off-label as a prophylaxis against vestibular migraines (i.e., migraines related to the vestibular function or that involve vestibular-like symptoms such as vertigo). *See https://link.springer.com/article/10.1007/s00405-015-3874-4* (last visited September 22, 2022)*; https:// migraine.com/living-migraine/triggered-by-weather-this-medication-may-help* (last visited September 22, 2022)*.

In the first week of September 2018, Plaintiff started on Aimovig, a monthly injection to reduce the frequency of migraine headaches. [AR 1014]. On September 13, 2018, Dr. Miller at the Lafayette Center for Pain Management noted Plaintiff's continuing pain notwithstanding past treatments and medications and recommended additional ketamine infusions, with a further suggestion that Plaintiff retry Botox. Dr. Miller also thought Plaintiff should consider a referral to the Michigan Head Pain and Neurologic Institute. [AR 531]. Plaintiff was seen by the neurology nurse practitioner around this time. She reported that she continued to have visual disturbances in the right eye, and that she felt tired and unbalanced all the time as well as very depressed about the lack of benefit from all the treatments that had been attempted. The nurse practitioner prescribed a trial of acetaminophen with codeine for acute migraines and encouraged Plaintiff to follow-up on the referral to the Michigan Head Pain and Neurologic Institute. [AR 600-601, 1014]. Towards the end of September 2018, Plaintiff decided it had become untenable for her to continue to work. [AR 586].

Due to a change in her insurance, Plaintiff began seeing Dr. Shazia Siddiqui at the Lafayette Pain Management Clinic in February 2019, complaining that her neck pain had returned. She reported having the pain for a long time until Dr. Fitzgerald at the Lafayette Center for Pain Management did a series of RFA procedures, which gave her a year of relief and helped her migraines as well. She asked about getting additional RFA injections. She described the worst pain as a 10 out of 10, with the average being a 6 out of 10. Dr. Siddiqui recommended that Plaintiff try physical therapy. [AR 1143-1146].

In March 2019, Plaintiff reported to Dr. Siddiqui that she noticed a small decrease in pain after physical therapy, but it had not been long lasting. She also felt that the physical therapy was responsible for rib pain she suddenly began experiencing with no apparent cause, for which she had to seek treatment at the hospital. She was advised by the doctors at the hospital to treat the rib

pain with medication she already had, but Plaintiff explained that did not give her any options for pain relief because the Tramadol was prescribed by her neurologist for migraines and she was only allowed to take 14 per month. She once again reported that the only relief she had gotten in the past for her migraines was the RFA procedures that Dr. Kowlowitz had given her. Dr. Siddiqui's physical examination findings included "spine pain exacerbated on extension and rotation, and increased pain to facet loading maneuvers." [AR 1155 *see also* AR 1150 (exhibits significant decreased mobility and increased tissue restriction)]. He decided to proceed with a cervical medial branch block (CMBB) as a diagnostic measure to "to determine [the] source of pain because there is a discrepancy between pathology and complaints and it is unclear whether patient's pain is central or peripheral in origin." [AR 1156 ].

Also in March 2019, Plaintiff had a follow-up visit with her neurologist, Dr. Du. She reported that her migraines had improved with monthly Aimovig injections, both in terms of frequency and severity. Plaintiff also reported, however, that she continued to have some migraines and was anxious that they might return at previous levels. She asked Dr. Du to do a spinal tap because she was no longer able to see Dr. Kowlowitz due to an insurance change. Dr. Du agreed, and the procedure was performed on May 6, 2019 [AR 1192-1194, 1200]. Dr. Du also started Plaintiff on Medrol Dosepak to decrease the severity of her current headaches, and if that did not work he planned to start dexmanthesone treatments. [AR 1186].

On June 27, 2019, Plaintiff was seen for the first time by a new treating otolaryngologist, Dr. Yates. She told Dr. Yates that she had not experienced vertigo since her vestibular neurectomy, but she also reported that she trips and falls frequently, and suffers from dizziness. Dr. Yates noted that Plaintiff "has left-sided Meniere's disease and constant imbalance due to a combination of Meniere's and history of vestibular neurectomy as well as history of migraines." [AR 1208]. Dr. Yates told Plaintiff that she should not be having vertigo any more due to her 2017 vestibular

neurotomy. He recommended baclofen for her dizziness, and also referred her to a dizziness specialist for further evaluation. [AR 1320, 1408].

Also in June 2019, Plaintiff reported to her primary care physician that she was "not doing well," that her otolaryngologist had told her there was nothing more he could do for her Meniere's symptoms, and that she has had "drop attacks" where she will stand to walk, stumble, and feel pulled to the ground. She reported that she still has daily headaches despite her monthly injections for prevention, and used Tramadol for those but it did not help much. Plaintiff's primary care physician rated Plaintiff's depression as severe. [AR 1325-1329; *see also* AR 1424].

Throughout the rest of the summer of 2019, Plaintiff continued to report headaches, as well as increased tinnitus and intermittent vertigo without apparent triggers. [AR 1217, 1226, 1406, 1407]. At an appointment in November 2019 with her primary care physician, Plaintiff reported she was having a horrible pain in the far left chest with thoracic back pain. She told her doctor "I will not kill myself but I have given up," and said that she wakes up every day with a migraine. At another primary care visit in December 2019, Plaintiff reported feeling dizzy and light-headed with blurred vision after walking three to four steps. She said this was happening a couple of times a day. She also reported having had "two Meniere's drop attacks in the last three months," and said that the ENT specialist told her there was "nothing he can do and would see her every two years." Plaintiff reported she was extremely tired and was also suffering a flare-up of her fibromyalgia. [AR 1316]. At the end of December 2019, Dr. Siddiqui started Plaintiff on a trial of Norco. [AR 1435].

On February 5, 2020, Plaintiff had an office visit with her local otolaryngologist in Lafayette, at which she reported that she started having tinnitus in the right ear and chronic dizziness, but no vertigo. Plaintiff said that the dizziness was disabling and that she could not walk straight. She reported that the medications she was taking did not provide relief for the dizziness.

[AR 1414-1415]. The next day, Plaintiff received a sphenopalatine ganglion block[32] for migraine and dizziness. [AR 1422]. Shortly thereafter, at a follow-up visit with the pain management nurse, Plaintiff reported that the previously completed CMBB/RFA series had been helpful for her neck pain but not for her headaches. She also reported that the sphenopalatine ganglion block had not helped. Her migraines occurred about two to three times per week, but she also reported daily headaches that affected her day-to-day activities. Plaintiff reported that Norco was helpful but that it did not last the entire day. She said that she would like to try ONB [Occipital Nerve Block] for further pain relief, which Dr. Siddiqui later scheduled. [AR 1431].

On February 17, 2020, Plaintiff was seen in neurology following worsening of migraines. She stated that she had been having daily headaches, that she was taking Aimovig, which helped for a few months, but she also stated that it was not working anymore and that she took verapamil instead. In addition, she reported numbness in the arms and legs, and that the meclizine did not work for her dizziness. Dr. Du prescribed Emgality to replace Aimovig, which had stopped working. [AR 1426].

On March 26, 2020, Plaintiff reported to her primary care physician that her pain management physician had started her on hydrocodone, but that it did not help much more than Tramadol. She saw the neurology nurse practitioner on April 28, 2020 to whom she reported that she was having episodes of numbness mostly on the left side of the face, occurring on a daily basis, with pins and needles sensation and a feeling of heaviness. She also reported numbness and tingling that radiated down from the elbow to the second and third fingers. [AR 1474, 1487].

---

[32] Sphenopalatine ganglion block is a procedure in which a local anesthetic is delivered to the sphenopalatine ganglion (SPG)—a group of nerve cells located behind the nose—to relieve headache pain. *https://www.barrowneuro.org/treatment/sphenopalatine-ganglion-block/* (last visited September 22, 2022).

On June 8, 2020, Plaintiff reported in a follow-up appointment with Dr. Siddiqui that she had been using hydrocodone more than prescribed due to not having a "rescue" medication when she gets severe migraines. Dr. Siddiqui strongly cautioned against self-escalation of controlled medications, instructing Plaintiff to call the office for proper recommendations if she was in increased pain. He recommended a bilateral occipital nerve block injection and that she ask her neurologist about a rescue medication in place of escalating the Norco. [AR 1520, 1522].

On August 6, 2020, Plaintiff reported to her primary care physician that she had a bad flare-up of fibromyalgia and could not even open jars. She said that she could only walk for twenty minutes at a time, and then would get dizzy. She reported this was a "new problem" for her because normally the pain is only in her hips and legs. She reported that her hands were swelling and she spent ten days in bed, her anxiety was horrible, and she wakes every morning with pounding headaches. [AR 1482, 1508].

### 3.    EXPERT OPINIONS AND SYMPTOMS[33]

Plaintiff described her limited daily activities in a Function Report completed on February 2, 2019. In the Remarks section of the report, Plaintiff stated that she has been fighting her illnesses for years and tried several symptom control measures, and yet the only symptom that has gone away is "violent vertigo." "No known cause and no known cure is always what [she] hear[s]." She feels that her life activities are severely limited as a result of her conditions, and that she is a burden on the people around her. Plaintiff reported severely limited daily activities, which report is supported by a Third-Party Function Report completed by her boyfriend, with whom she lives.[34]

---

[33] The SSA "define[s] a symptom as the individual's own description or statement of his or her physical or mental impairment(s)." SSR 16-3p, 2017 WL 5180304, at *2 (citing 20 C.F.R. § 404.1502(i)).

[34] *See* [AR 332 ("unable to function normal on a daily basis; spends a majority of her day trying to relieve her symptoms of vertigo and headaches); AR 333 (vertigo makes it difficult for her to

Plaintiff also stated that she loved her last job but that "every attack is so random [she] cannot be relied upon."

On March 9, 2019, Plaintiff completed a Headache Report in which she described first experiencing occasional migraines in 1997, which increased in intensity and number after having a vestibular nerve section in 2017. She reported that she does not know what causes them, and that they can be triggered by diet, stress, environmental factors, overstimulation, or computer use. She also wrote that they can happen during sleep. Plaintiff described the headaches as intense pain in the neck, base of the skull, right and left temples, and eye, and that she also experiences nausea, colored spots, sensitivity to light, intolerance to heat, and dizziness with them. She reported that her headaches occurred daily and can last all day, and that she has a migraine three to four times a week, which can sometimes last up to two weeks. She reported that she had exhausted most medications and infusion treatment options in trying to obtain relief from her migraine pain.

At the request of the SSA, Plaintiff appeared for a Mental Status Examination on April 4, 2019. When asked about the nature of her disability, Plaintiff stated that she has both Meniere's disease and chronic migraine headaches. The Meniere's disease causes her to be extremely dizzy and faint, and the headaches occur on a daily basis. In fact, she reported, she was experiencing a migraine right then, which had already lasted for several days. She also reported waking up in the night with migraine symptoms. She gets anxiety because of her physical symptoms, especially when her pain increases, most recently for instance when her fibromyalgia flared up. Plaintiff

---

bend and dress, must always use safety handles; frequently wakes up at night from headaches and has to treat with ice); AR 334 (vertigo and headaches make it impossible for her to stand to cook); AR 337 (social activities have decreased to 0% since her illness); AR 339 (she was once a skilled IT technician and is no longer able to do anything; she has a headache every day and is impacted daily physically and emotionally; "[s]he is simply unable to maintain the activity level necessary to function as a complete individual")].

reported that she was not socially active but tries to do a couple of chores around the house each day. She gets angry daily, stating that her conditions have "ruined [her] life." The only opinion stated in the examiner's report was that Plaintiff "appears capable of independently managing her funds." The examiner also stated that Plaintiff's background information and commentary appeared to support a diagnosis of major depressive disorder.

On April 12, 2019, agency reviewers at the initial level determined that Plaintiff was not disabled. The agency reviewers acknowledged ongoing treatment for migraines and Plaintiff's reports that the pain was mostly constant. The agency reviewers pointed to objective findings in brain MRIs, MR brain venography, and MRI of the spine, as well as Plaintiff's acknowledgement that her vertigo was markedly improved. The agency reviewers concluded that Plaintiff's primary severe impairment was depressive disorder and that her migraines were only a secondary severe impairment. The only listing impairments considered were for depression and anxiety. The agency psychological reviewer found a moderate limitation in concentration, persistence, or maintaining pace, and mild limitations in all other areas of mental functioning. The agency physical reviewer found Plaintiff capable of work with no exertional limitations, occasional balancing, occasional climbing of ramps or stairs, no climbing of ladders, ropes or scaffolds, and avoidance of even moderate exposure to noise.

On April 22, 2019, a physical RFC assessment was completed by Dr. Ostrowski, Plaintiff's former treating otolaryngologist.[35] Dr. Ostrowski reported that Plaintiff had "permanent balance loss from left ear due to Meniere's disease and previous vestibular neurectomy." [AR 1170; *see also* AR 1167 ("only has partial balance function"); AR 1169 (has moderate left hearing loss due

---

[35] Due to a change in insurance, Plaintiff was last seen by Dr. Ostrowski in May 2018. [AR 22, 99]. Her next appointment with an otolaryngologist after that was on June 27, 2019, when she saw Dr. Yates for the first time. [AR 1205-1209; AR 1256-1258].

to Meniere's disease and "no balance function from left ear")]. Dr. Ostrowski opined that Plaintiff could stand or walk for at least two hours in an eight-hour day and sit for about six hours in an eight-hour workday, and that she could never balance or climb ladders, ropes, or scaffolds. He also opined that Plaintiff should avoid rapid or alternating/repetitive movements, and that she "will fatigue easily due to Meniere's disease."

On August 14, 2019, the agency reviewers at the reconsideration level considered Plaintiff's additional treatment records through that date. The reviewers noted that the only update Plaintiff had given since her previous reports was that her migraines, neck pain, tinnitus, and dizziness were all worse. The physical reviewer, however, cited a comment in one medical record from April 2019, which said that Plaintiff's pain was somewhat manageable with current medications and activity modifications. The reviewer affirmed the original decision based on a finding that Plaintiff did "not have listing level migraines," and instead had only "[o]n-going mixed headaches that have not required rescue care." As to Plaintiff's allegations of dizziness, the reviewer noted Dr. Yate's June 2019 "normal physical exam of the anatomy of the ears," and pointed out that Dr. Yates had ordered physical therapy for constant imbalance due to Meniere's and history of vestibular neurectomy. In addition, the reviewer noted that, in May 2019 Plaintiff "presented with a cane due to dizziness" but had a "normal over-all neurology exam," and then pointed again to Dr. Yates' June 2019 "relatively normal [ENT] exam." Nevertheless, the reconsideration physical assessment differed somewhat from the initial reviewer's assessment. The reconsideration reviewer found that Plaintiff could perform medium work, with a six hour limit on standing, walking, or sitting, in jobs that could require up to frequent balancing, stooping, kneeling, crouching, and crawling, with the further limitation that Plaintiff should "[a]void concentrated exposure" to noise.

On May 14, 2020, Plaintiff testified during the hearing before the ALJ that the primary reasons she has been unable to work since September 2018 were her dizziness and her migraine headaches. Plaintiff testified that her dizziness increases with the pain and nausea, and often comes from looking at a screen or monitor longer than twenty minutes. She has to stop doing whatever she is doing and rest. She also testified that she gets sensory overload and dizziness from being around too many people, bright lights, loud noises, and even smells. Quick head movements or bending down to pick something off the floor also can cause dizzy spells. She gets dizzy spells about two or three times an hour, which last about two minutes each. She testified that she does not leave the house more than about twice a week, and when she does, she uses a four-point cane for walking and balance due to dizziness. When she has to walk more than a block, she will use a walker. She only takes short trips to the grocery store and does not do so by herself.

As to the migraines, Plaintiff testified that before she started getting monthly injections, she had about twenty migraines per month, with each one lasting about five or six hours. She then began treatment with monthly injections of Aimovig, which helped to reduce her migraines to about ten per month and also decreased the pain level of the migraines to about a five or six (out of ten) on the pain scale. The Aimovig stopped working, however, and she began treating with monthly injections of Emgality in December 2019. With the Emgality, Plaintiff still has about ten migraines per month with an average pain level of six. When she gets a migraine, she has to go to a dark room and lay down. She feels the pain mainly in the left temple and base of her skull. She also experiences different colored spots, blurriness in her left eye, and dizziness. In addition, Plaintiff testified that she still experiences occasional tinnitus in the left ear, and that, when it happens she can sometimes get nauseated and cannot leave the house. She experiences that level of tinnitus about three to four times a week, and it can sometimes last for days. Plaintiff testified that she uses a cane due to pain in her legs and dizziness, to prevent her from falling when standing.

Plaintiff also testified that she takes anti-depressants and anxiety medications and sees a therapist twice a month. She testified that she has trouble concentrating or focusing on tasks because of dizziness, migraines, depression, and anxiety. She usually gets dizzy doing housework and will need to go to a dark room and lie down about two to three hours every day of the week. Even though she uses a cane when she gets up, she still has had drop attacks, where her body just lets go and she falls. If she stands using her cane, she believes she could lift about 10 pounds with the other hand and stand for about 20 minutes. If she stands longer than that, she will get dizzy and experience pains in her legs. She also has problems with numbness from sitting more than an hour at a time.

Following the initial ALJ hearing, on May 21, 2020, Dr. Fischer, an impartial medical expert, responded to written medical interrogatories. Dr. Fischer stated that he reviewed Plaintiff's medical records in their entirety and that they documented her physical impairments from the alleged onset date of September 14, 2018 to present to include cervical spine degenerative disc disease (DDD), headaches, Meniere's Disease, sensorineural hearing loss, and fibromyalgia. Dr. Fischer considered Listing 1.04, Musculoskeletal disorders, Listing 2.07, Disturbance of the labyrinthine-vestibular function, Listing 2.10, Hearing loss, and Listing 11.02, Epilepsy (seizures) (also used to equal claimants who have headaches). Dr. Fischer found that Plaintiff did not meet or equal any of the considered Listings, and therefore proceeded to assess Plaintiff's RFC. Dr. Fischer opined that Plaintiff had the RFC to work at jobs at the sedentary physical exertional level. He further opined that Plaintiff could stand and walk for thirty minutes at one time for up to a total of two hours in an eight-hour work-day, and that she could sit for up to two hours at one time for a total of six hours in an eight-hour work-day. Dr. Fischer also opined that Plaintiff did not require the use of a cane to ambulate and that she could stoop, kneel, crouch, and crawl

frequently but that she should never climb ladders or scaffolds and never balance, and that she should not be exposed to more than moderate noise levels.

At the supplemental hearing on October 20, 2020, the ALJ asked a vocational expert (VE)[36] about a hypothetical person with the RFC found by Dr. Fischer, which is also the RFC adopted by the ALJ. For the mental limitations, the ALJ used the same limitation she ultimately adopted in her decision of a person who could understand, remember, and carry out detailed but not complex tasks. The VE testified that the hypothetical person could perform the jobs of information clerk, receptionist, and telephone clerk. For a second hypothetical, the ALJ added the limitation found in Dr. Ostrowski's opinion that the person should avoid repetitive or repeated movements, and the VE testified the same three jobs would still be available. For a third hypothetical, the ALJ changed the mental limitation to simple and routine tasks, free of fast-pace or time piece-rate production work but can meet end of day goals. With this different mental RFC, the VE testified that the previous identified jobs would be eliminated but that there were other jobs the hypothetical person could perform, including document preparer, call-out operator, and address clerk. Finally, the ALJ added the need to use a cane for ambulation, but the person could still use the contralateral upper extremity to lift and carry up to the sedentary exertional level. The VE responded that adding this limitation to any of the previous hypotheticals would not change the result. The VE also testified that an employer's tolerance for absences would be no more than one day per month in a given year, and that an employer's tolerance for off-task time would be less than 15 percent of the work-day. If the hypothetical person were to miss more than one day per month, she would be terminated.

---

[36] The ALJ elicited VE testimony at the initial hearing as well, but she ultimately relied on the testimony of a second VE at the supplemental hearing.

And if the hypothetical person were off-task on a consistent basis due to headache pain or dizziness, she would not be able to maintain any competitive work.

## **STANDARD OF REVIEW**

The question before the Court upon judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) is not whether the claimant is in fact disabled, but whether the ALJ's decision "applies the correct legal standard and is supported by substantial evidence." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); 42 U.S.C. § 405(g). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)). Apart from a legal error, however, the Court must accept the Commissioner's factual findings as conclusive if they are supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). The ALJ must articulate an analysis of the evidence to allow the reviewing court to trace the path of reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ also has a basic obligation to develop a full and fair record, and he or she "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

## ANALYSIS

In this appeal, Plaintiff argues that the ALJ erred by failing to properly evaluate her subjective symptoms under SSR 16-3-p. Plaintiff also argues that the ALJ should have included limitations in the RFC and hypothetical questions posed to the VE regarding Plaintiff's need for a cane or rollator for balance. Finally, Plaintiff contends the ALJ's RFC finding is not supported by substantial evidence because it does not include any limitations related to time off-task or absenteeism.

### SYMPTOM EVALUATION

An ALJ follows a two-step process to evaluate a claimant's subjective complaints. *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029. First, the ALJ determines whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3. Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At the second step, the ALJ is not bound to take the claimant's statements at face value. *See* 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled."). Instead, the ALJ first considers the claimant's subjective symptom allegations in light of the objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *4. But SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." *Id.* Thus, if the objective medical evidence is insufficient to find in the claimant's favor, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them.

29

*Id.* at *5. In that situation, the ALJ is directed to consult "other evidence," including statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms such as:

(1)    the claimant's daily activities;

(2)    the location, duration, frequency, and intensity of pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of medication;

(5)    treatment other than medication the individual receives for relief of pain or other symptoms;

(6)    measures other than treatment an individual uses to relieve pain or other symptoms (e.g., lying flat on her back, sleeping in a dark room), and

(7)    other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *6-8.

Here, the ALJ concluded that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," thus satisfying the first step of the symptom evaluation framework. In this regard, the ALJ noted that Plaintiff "has a history of fibromyalgia, Meniere's disease, and migraines/headaches"; that "[s]he also has a history of vertigo/dizziness"; and that she "underwent a vestibular neurectomy in April of 2017, as well as a sphenopalatine ganglion block in February of 2020." But at the second step of the symptom evaluation framework, the ALJ found Plaintiff's statements about the severity, persistence, and limiting effects of her symptoms to be "not entirely consistent with the medical evidence and other evidence in the record." The ALJ's statement and presumption that symptoms need to be "entirely consistent" with the medical evidence and other evidence in the record "is inconsistent with the governing regulations," which require the ALJ "to evaluate a claimant's symptoms and determine

'the extent to which [ ] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.'" *Brenda L. v. Kijakazi,* No. 3:21CV859, 2022 WL 2763561, at *7 (N.D. Ind. July 15, 2022) (quoting 20 C.F.R. § 404.1529(a)). Aside from citing a legally incorrect "not entirely consistent" standard,[37] the ALJ also engaged in impermissible cherry-picking and failed to explain which of Plaintiff's symptoms "she found consistent or inconsistent with the evidence or why the evidence implied Plaintiff was not as limited as she reported." *Id.* at *8. As discussed below, the ALJ's decision does not reflect adequate consideration of the evidence regarding the frequency, duration and disabling impact of Plaintiff's pain and dizziness from her impairments. *See, e.g., Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) "(Notably absent from the ALJ's order is a discussion of how [the plaintiff's] headaches and blurred vision affected her ability to work. The ALJ also failed to include headaches or blurred vision in the list of work-related impairments submitted to the VE."); *Henderson v. Astrue,* No. 1:01-cv-286-LJM-JMS, 2010 WL 679933, at *16 (S.D. Ind. Jan. 11, 2010) (although the ALJ found that the plaintiff's "testimony about her limitations was not entirely credible, he did not specifically address her testimony regarding the frequency, duration, and disabling impact of her migraine headaches").

The ALJ first observed that Plaintiff reported she was unable to work because she suffers from pain in her head and neck, neuropathy, numbness, and weakness in her legs, tinnitus in her left ear, and dizziness. The ALJ also recounted Plaintiff's reports that she has problems sitting, standing, walking, and lifting; required the use of a cane and/or walker; is limited in her ability to

---

[37] Some courts have found this legal error to be reason enough to reverse. *See, e.g., Minger v. Berryhill, 3*07 F. Supp. 3d 865, 871–72 (N.D. Ill. 2018) (finding reversible error because the regulatory standard for evaluating a claimant's symptoms is "clearly a different, and a not as rigorous, a standard" as the "not entirely consistent" standard applied by the ALJ); *see also Christine C. v. Saul,* No. 19-CV-1981, 2020 WL 5702144, at *2–3 (N.D. Ill. Sept. 24, 2020) (discussing conflicting authority as to whether the "not entirely consistent" language is fatal if adequate further analysis is provided).

bend, hear, and climb stairs; has problems sleeping at night and experiences fatigue during the day; has memory, focus, and concentration problems; and has difficulty understanding and staying on task.  The ALJ did not specifically mention migraine headaches in this list of symptoms (referring more generically to "pain in her head"). The ALJ then cited the following evidence as undermining Plaintiff's symptom reports: (1) diagnostic imaging of Plaintiff's brain, which the ALJ characterized as "unremarkable," (2) an MRI of Plaintiff's cervical spine in September 2017, which the ALJ said showed only small disc protrusions at C2-3 and C3-4 as well as disc bulging at C5-6; (3) an EMG and nerve conduction study, which the ALJ said "showed only mild L4 radiculopathy, as well as only mild C6/7 radiculopathy, and was otherwise normal"; (4) medical records indicating that Plaintiff "has often had full range of motion in her neck"; (5) medical records indicating that Plaintiff has "routinely displayed normal strength and sensation"; (6) medical records indicating that Plaintiff "has had no tenderness in her back"; (7) medical records indicating that Plaintiff has "demonstrated full range of motion in her extremities"; (8) a single medical record indicating that Plaintiff's "symptoms of vertigo were markedly improved following the vestibular neurectomy"; (9) medical records indicating that Plaintiff has "often been noted to have a normal gait and station"; (10) medical records indicating Plaintiff "has consistently been awake, alert, and oriented"; (11) the testimony of the impartial medical expert that an assistive device was not "medically necessary"; (12) medical records indicating that Plaintiff hears well; (13) a single medical record indicating that Plaintiff's headaches were "noted to be improved with medication"; and, lastly, (14) medical records indicating that Plaintiff has "frequently been in no acute distress." [AR 20-21].

### A.    OBJECTIVE MEDICAL FINDINGS

The first way the ALJ erred in her symptom evaluation is by relying too heavily on objective medical findings such as diagnostic imagining of Plaintiff's brain, an MRI of Plaintiff's

cervical spine, and an EMG and nerve conduction study. This reliance was inappropriate in the context of the central reason why Plaintiff alleges she is unable to work—her disabling migraines, neck pain and dizziness. By expecting to find objective medical findings to support Plaintiff's symptom reports, the ALJ displayed a fundamental misunderstanding about Plaintiff's impairments. As the Seventh Circuit stated in *Sarchet*, 78 F.3d at 306, the cause of fibromyalgia is "unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." That is, "[t]here *are no* laboratory tests for the presence or severity of fibromyalgia." *Id.* (emphasis added). Similarly, in *Moon v. Colvin*, 763 F.3d 718 (7th Cir. 2014), the Seventh Circuit found the ALJ's reliance on the claimant's "unremarkable" MRI in discounting the claimant's testimony about his migraines to be unsupportable, explaining that "[d]octors use MRIs *to rule out other possible causes of headache*—such as a tumor—meaning that an unremarkable MRI is completely consistent with a migraine diagnosis." *Id.* at 722 (emphasis in original); *see also Fields v. Colvin*, 213 F. Supp. 3d 1067, 1072 (N.D. Ind. 2016) (stating that the ALJ's "central error" was her "misunderstanding of the diagnosis and treatment of migraine headaches"); *Wiltz v. Barnhart*, 484 F. Supp. 2d 524, 532 (W.D. La. 2006) ("The ALJ's insistence upon objective medical evidence of Wiltz's migraine headaches was error."); *Ortega v. Chater*, 933 F. Supp. 1071, 1075 (S.D. Fla. 1996) (present-day laboratory tests cannot prove the existence of migraine headaches); *McCormick v. Sec. of Health & Human Servs.*, 666 F. Supp. 121 (E.D. Mich. 1987) (migraine headaches are not traced easily to an objective medical condition), *aff'd*, 861 F.2d 998 (6th Cir. 1988). The same analysis applies to Plaintiff's claim of dizziness from Meniere's disease. *See*, e.g*., Sorber v. Comm'r of Soc. Sec. Admin,* 362 F. Supp. 3d 712, 725-26 (D. Ariz. 2019) (holding that the ALJ erred where the plaintiff's Meniere's disease or vestibular migraines were likely to cause frequent daily attacks of dizziness but the ALJ rejected the

plaintiff's symptom testimony on the ground that it was not supported by the objective medical evidence).

Contrary to the Commissioner's contention that the ALJ properly evaluated the record evidence regarding Plaintiff's migraine headaches, the ALJ seemed to "believe[ ] that Plaintiff's complaints of disabling headache pain were undermined by the lack of objective medical evidence or imagining evidence to suggest an abnormality that caused migraines." *Fields*, 213 F. Supp. 3d at 1072. The ALJ misunderstood "that migraine headaches do not stem from a physical or chemical abnormality that can be detected by imagining techniques, laboratory tests, or physical examination, but are linked to disturbances in cranial blood flow." *Id.* (internal quotation marks and citations omitted). It is for this very reason that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." *Cole v. Colvin*, 831 F.3d 411, 416 (7th Cir. 2016) (internal quotation marks and citation omitted); *see also Arakas v. Comm'r, Soc. Sec.*, 983 F.3d 83 (4th Cir. 2020) (this type of legal error "is particularly pronounced in a case involving fibromyalgia," where the ALJ relied principally on physical examination results that showed full range of motion, lack of joint inflammation, etc., thus "effectively requir[ing] objective evidence for a disease that eludes such measurement" (internal quotation marks and citation omitted)); *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015) (noting "the recurrent error made by the [SSA's] [ALJs], and noted in many of [the court's] cases, of discounting pain testimony that can't be attributed to 'objective' injuries or illnesses—the kind of injuries and illnesses revealed by x-rays").

The ALJ "appears to have afforded inappropriate weight to what she perceived [as an] absence of 'objective' evidence in the record," and she may have "made unsupported assumptions about the meaning of the absence of such findings." *Brenda L.*, 2022 WL 2763561, at *9. This

emphasis on objective medical evidence may have caused her to improperly discredit Plaintiff's testimony, requiring a remand. *See, e.g., Gilbert v. Astrue,* No. 09 C 7028, 2010 WL 4074276, at *11 (N.D. Ill. Oct. 8, 2010) (stating that, contrary to the ALJ's findings, "the objective medical evidence appear[ed] to be consistent with [the plaintiff's] [symptom] testimony," because it showed a "significant medical history" and "treat[ment] with prescription medication").[38]

## B.    LOGICAL BRIDGE AND CHERRY-PICKING

The ALJ also failed to build a logical bridge between the evidence she cited and her assessment of Plaintiff's symptoms as being "not entirely consistent" with the record. Most notably is the assumption the ALJ appears to have made that Plaintiff's headaches were not disabling because they "have been noted to be improved with medication." [AR 21]. This singular statement cannot logically support the ALJ's RFC assessment without any discussion of the frequency, duration, and disabling impact of Plaintiff's migraine headaches and how treatment with various

---

[38] The ALJ also improperly played doctor by concluding that "unremarkable" and "otherwise normal" diagnostic imaging and MRIs did not support Plaintiff's symptom reports. "ALJs may not draw their own conclusions from medical imaging, as they lack the expertise to interpret it." *Arakas*, 983 F.3d at 109-110 (citing *Hoyt v. Colvin*, 553 F. App'x 625, 627 (7th Cir. 2014) (holding that ALJ erred "by interpreting [the claimant's] electromyography exam and lumbar MRI as inconsistent with his complaints of pain")). Not only was the ALJ playing doctor, but she may have gotten it wrong. There are several indications in the medical records that Plaintiff's diagnostic imaging and MRI results did indicate a source for Plaintiff's chronic pain. *See* [AR 1477 (noting that Plaintiff's 2018 MRV brain showed "significant diffuse hypoplasia of left transverse sinus with a diminished caliber of the left sigmoid sinus"); AR 1439 ("The patient has pain of well-documented cervical facet joints origin as evidenced by successful response to two separate sets of diagnostic medial branch nerve blocks); AR 1152 (pain management doctor reviewed Plaintiff's cervical and brain MRIs and reported that "[t]he hyperplasia is cause for concern to me"); AR 604 (MRI on August 16, 2018 showed some metallic artifact along the base of the left occiput most pronounced on the gradient echo images); AR 558, 1071 (MRV brain on August 21, 2018 shows "significant hypoplasia of the left transverse sinus and diminished caliber of the left sigmoid sinus (small, but patent"; "[i]n some people, this can be a normal variant," but neurology nurse practitioner thought it might be "playing a role in [Plaintiff's] headaches")]. Thus, the ALJ was possibly "doubly" wrong by relying on an incorrect legal standard to require objective medical evidence of Plaintiff's pain *and* ignoring objective evidence that "*was present* in this case." *Arakas*, 983 F.3d at 96 (emphasis in original).

medications affected those matters. The ALJ does not discuss Plaintiff's neurology records indicating that, as of May 20, 2019, Plaintiff had tried nine different medications for prevention of migraines and nine different medications for treatment of acute symptoms from migraines. [AR 1184]. While Plaintiff reported that the Emgality had been helping with prevention of migraines, and that she had been going to urgent care less frequently since starting this medication, she also reported that she still has daily headache, including a recent severe one that had been constant for thirteen days. And, despite the Emgality, she continued to ask her treating physicians for further treatments such as a ganglion block.

Furthermore, the ALJ did not explain how the fact that Plaintiff's vertigo was greatly improved following her vestibular neurectomy refutes Plaintiff's testimony concerning her dizziness and chronic pain. *See, e.g., Morreale v. Heckler*, 595 F. Supp. 907, 910-12 (E.D. Mich. 1984) (upholding the ALJ's determination that the plaintiff's Meniere's disease did not meet the listings but nevertheless finding that the ALJ erred in his assessment that the plaintiff's allegations of disabling dizziness were not credible). She also failed to explain the inconsistency between Plaintiff's reports of dizzy spells and chronic pain and the cited facts that Plaintiff hears well, that she has been seen with normal gait and station, and that an assistive device is not "medically necessary." *See, e.g., Brenda L*, 2022 WL 2763561, at *8 ("[T]he ALJ did not explain how some exams demonstrating normal gait and lack of sensory or motor deficits undermined Plaintiff's symptom reports regarding her pain. Plaintiff did not allege she was unable to walk …. Instead, she reported increasing pain with maintaining positions such as prolonged standing, walking and even sitting.").

The record "indicates that treatment was anything but conservative: providers were prescribing a smorgasbord of prescription medications, including injections and nerve blocks, to try to combat [Plaintiff's] headaches. …The extent her care providers went to try to alleviate

[Plaintiff's] headaches suggests that they believed her symptoms were severe and frequent." *Nowak v. Saul*, No. 20-CV-1088-SCD, 2021 WL 1263753, at *10 (E.D. Wis. Apr. 6, 2021 (citing *Merriman v. Berryhill*, No. 16 CV 50073, 2017 WL 2345551, at *6 (N.D. Ill. May 30, 2017) ("Plaintiff took numerous medications for pain and other symptoms … These were not over-the-counter medications, and there is no evidence that doctors viewed them as conservative treatments.")); *see also Lambert v. Berryhill*, 896 F.3d 768, 778 (7th Cir. 2018) (citing *Israel v. Colvin*, 840 F.3d 432, 441 (7th Cir. 2016) (that a claimant has undergone painful and risky procedures in attempts to alleviate pain would seem to support the credibility of claims regarding the severity of pain)); *Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018) (citing *e.g.*, *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)) (finding doctor's prescription for strong pain medications corroborated claimant's credibility regarding pain)). The ALJ did not confront any of this evidence. "When the ALJ fails to mention an entire line of evidence in h[er] decision, [the Court] is unable to conduct meaningful review." *Herron v. Shalala,* 19 F.3d 329, 337 (7th Cir. 1994).[39]

The Commissioner argues that no line of evidence was ignored by the ALJ, stating that "[t]he ALJ noted that Plaintiff's treatment history consisted of various procedures and medications

---

[39] *See, e.g., Fields*, 213 F. Supp. 3d at 1072 ("The ALJ further assumed that Plaintiff's headaches were not disabling because she was never hospitalized for her headaches. The ALJ again 'plays doctor' by reaching her own independent medical conclusion that Plaintiff must seek hospital treatment in order for her headaches to be disabling."); *Christina B. v. Kijakazi*, No. 1:20-cv-1936-DLP-JRS, 2022 WL 178606, at *10 (S.D. Ind. Jan. 20, 2022) ("[The plaintiff] has put forward evidence that she now has to receive monthly injections from her neurologist and may need two injections per month, along with taking an abortive medication for breakthrough headaches at least 15 days per month. Furthermore, even with that treatment, [the plaintiff's] breakthrough headaches can cause light and sound sensitivity, blurry vision, numbness, tingling, and loss of speech. No medical expert reviewed this evidence, yet the ALJ concluded on her own that [the plaintiff's] 'migraines have improved *significantly* with prescribed treatment.'" (internal citations omitted, emphasis added by court)).

that often improved her symptoms." [*Id.* at 4 (citing AR 20-21)]. That is an overly generous characterization of the ALJ's decision, however. The ALJ noted only two pieces of evidence regarding improvements in symptoms, and neither of them logically supported her conclusions. The first was the reduction in vertigo from the vestibular neurectomy, which is not inconsistent with Plaintiff's reports of frequent and continuing dizzy spells and balance issues, notwithstanding improved vertigo symptoms, as previously discussed.

The second was a medical record from March 7, 2019 (Exhibit 19F/14) where it is noted that Plaintiff reported somewhat improved headaches with less severity and less frequency after taking Aimovig. "In this regard, the ALJ has taken an impermissible sound-bite approach to reviewing the evidence." *Brenda L.*, 2022 WL 2763561, at *9 (citing *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("[T]he ALJ identified pieces of evidence in the record that supported her conclusion …, but she ignored related evidence that undermined her conclusion. This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.")). As the Seventh Circuit repeatedly has emphasized, there is no logical basis for discounting evidence in the record that clearly demonstrates continuing pain symptoms merely because of a one-time self-report of improved symptoms. *See, e.g., Lanigan v. Berryhill*, 865 F.3d 558, 564 (7th Cir. 2017) (citing *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). "[O]ne's medical condition could improve drastically, but still be incapable of performing [ ] work. The key is not whether one has improved …, but whether they have improved enough to meet the legal criteria of not being classified as disabled." *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014); *see also Scott*, 647 F.3d at 739-40 ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce."). Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error to reject a claimant's testimony because of a few isolated instances of improvement over a period of months or years

and to treat them as a basis for concluding a claimant is capable of working. *See, e.g., Arkas*, 983 F.3d at 101 ("SSR 12-2p recognizes that 'symptoms of [fibromyalgia] can wax and wane so that a person may have "bad days and good days." Accordingly, the Ruling requires ALJs to 'consider a longitudinal record whenever possible' when evaluating a disability claim based on fibromyalgia." (quoting SSR 12-2p, 2012 WL 3104869, at *6)); *Brenda L.*, 2022 WL 2763561, at 8 ("The record is clear that Plaintiff's fluctuating pain levels, other factors such as her activity level, the weather, and the effectiveness of her medications, impacted her ability to function. A person who has a chronic impairment, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days.").

An ALJ may not "cherry-pick evidence from the record to support [her] conclusions, without engaging with the evidence that weighs against [her] findings." *Plessinger*, 900 F.3d at 915. Here, the ALJ ignored a vast amount of evidence demonstrating that, after Plaintiff's vestibular neurectomy and continuing through the dates of the hearings, Plaintiff suffered from frequent and dizziness and chronic pain, continuously sought treatment for the dizziness and chronic pain, and was prescribed medications by her treating physicians to control those conditions. The ALJ made no attempt to engage with this contrary evidence. Indeed, the ALJ questioned Plaintiff during the hearing on May 12, 2020 about her improvement from taking Aimovig, and Plaintiff explained that by the time of the hearing Aimovig had stopped working for her. In other words, not only did the ALJ single out only one office visit from Plaintiff's extensive medical records but she picked one that, at least according to the Plaintiff, did not reflect any lasting improvement in Plaintiff's condition.

The ALJ failed to build a logical bridge in other respects as well. For example, the ALJ cited to medical records indicating that Plaintiff has "frequently been in no acute distress." The ALJ cited generally to ten exhibits for this proposition without directing attention to where the 285

pages of medical records those exhibits encompassed a finding of "no acute distress." Assuming, however, that there were observations somewhere in the cited exhibits to that effect, such observations would not contradict Plaintiff's reports of dizziness and chronic pain. As one court explained, "[w]ithout an explanation of what [the doctor] meant by no acute distress, it cannot be assumed that Plaintiff was pain-free. 'No acute distress' generally means that the patient is conscious, not bleeding profusely, not struggling for breath, and other things of that nature indicating that the patient is not in need of immediate emergency care." *Id.*[40]

The same is true for the ALJ's general citation to fifteen exhibits consisting of 391 pages of medical records for the proposition that Plaintiff has appeared "awake, alert, and oriented." [AR 21]. The ALJ ignores a medical note on May 10, 2019 that Plaintiff was "chronically ill appearing." [AR 1224]. Moreover, "[t]he fact [that] [Plaintiff] did not have a headache at the time of that visit

---

[40] *See also Barnett v. Kijakazi,* No. 3:20-CV-413-JVB-JPK, 2021 WL 3728385, at *7 (N.D. Ind. July 26, 2021) ("That some of these records noted that Plaintiff did not appear to be in *acute* distress during an appointment did not contradict [the physician's] findings about limitations caused by chronic pain" (emphasis in original)), *report and recommendation adopted*, No. 3:20-CV-413-JVB-JPK, 2021 WL 3726879 (N.D. Ind. Aug. 23, 2021); *Nowak,* 2021 WL 1263753, at *10 ("[I]t's questionable whether any negative inference may be drawn from generic remarks that a patient is in 'no acute distress,' particularly when the appointment involves a chronic condition like headaches."); *Toni D. v. Saul*, No. 3:19-CV-820-SI, 2020 WL 1923161, at *6 (D. Or. Apr. 21, 2020) ("the generic chart note of 'no acute distress' is not a … convincing reason to discount Plaintiff's symptom testimony"); *Mitchell v. Saul*, No. 2:18-cv-01501-GMN-WGC, 2020 WL 1017907, at *7 (D. Nev. Feb. 13, 2020) ("notations that Plaintiff was healthy 'appearing' and in no 'acute' distress do not distract [sic] from the findings regarding Plaintiff's chronic conditions."), *report and recommendation adopted sub nom. Mitchell v. Berryhill,* No. 2:18-cv-01501-GMN-WGC, 2020 WL 1017899 (D. Nev. Feb. 28, 2020); *Richard F. v. Comm'r of Soc. Sec.,* No. C19-5220 JCC, 2019 WL 6713375, at *7 (W.D. Wash. Dec. 10, 2019) ("Clinical findings of 'no acute distress' do not undermine Plaintiff's testimony. 'Acute' means 'of recent or sudden onset; contrasted with chronic.'" (record citation omitted)); *Wanserski v. Colvin*, No. 1:14-CV-1033-DKL-JMS, 2015 WL 5692521, at *7 (S.D. Ind. Sept. 28, 2015) ("'To physicians, "No Acute Distress" means that your patient will probably not become unstable in the next 5 minutes.' Without an explanation of what the recording medical professionals meant by 'no acute distress,' it cannot be simply assumed, as the ALJ did, that they meant that [the plaintiff] did not experience migraine-headache pain to the degree that she alleged." (footnote with citation omitted)).

is no reason to conclude anything about the frequency or severity of her migraines." *Moon*, 763 F.3d at 721. "Although [Plaintiff] alleged at times that she has constant headaches, she did not allege that they are always of disabling severity; thus, the fact that she [appeared 'awake, alert, and oriented'] at the times of certain examinations is insubstantial evidence that she never experiences the degree of symptoms that she alleged." *Wanserski*, 2015 WL 5692521, at *7.

The decision's cherry-picking and logical bridge deficits are particularly troublesome because the ALJ made little attempt to apply the analysis required by SSR 16-3p. For instance, there is minimal to no discussion in the ALJ's decision of the categories of other evidence that SSR 16-3p directs the ALJ to consider: (1) Plaintiff's daily activities (no discussion); (2) the location, duration, frequency, and intensity of pain or other symptoms (one medical record cited); (3) factors that precipitate and aggravate the symptoms (no discussion); (4) the type, dosage, effectiveness, and side effects of medications (an incomplete reference to a single medication); (5) treatment other than medication the individual receives for relief of pain or other symptoms (no discussion); (6) measures other than treatment an individual uses to relieve pain or other symptoms (no discussion). "If the medical record does not corroborate the level of pain reported by the claimant, the ALJ must develop the record and seek information about the severity of the pain and its effects on the applicant." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). But the ALJ's review of the issues listed in SSR 16-3p is sorely lacking. She should have addressed the evidence concerning the severity of Plaintiff's pain and its effects on her even with taking medications. She also should have discussed Plaintiff's entire course of treatment, not just one medical procedure (vestibular neurectomy) that improved one symptom (vertigo), or one treatment note indicating improvement in the immediate aftermath of trying one medication (Aimovig), a medication that Plaintiff testified later stopped working. The entire course of Plaintiff's treatment "strongly supports and does not detract from" Plaintiff's symptom reports, *Brenda L.,* 2022 WL

2763561, at *9, and nothing in the decision indicates that the ALJ took that into consideration when the ALJ concluded that Plaintiff's symptom reports were not as severe as she claimed.

## C.    DR. FISHER'S OPINION

The Commissioner cites to Dr. Fisher's opinion in arguing that the ALJ's symptom evaluation is supported by substantial evidence. Dr. Fischer opined both as to whether Plaintiff's impairments met any Listing[41] and on Plaintiff's RFC given her impairments. The ALJ accepted Dr. Fischer's opinions on these matters as "persuasive" because his opinions were "supported by the objective evidence reviewed by this doctor," and "also consistent with all the other evidence in the record from all other sources." [AR 22]. These conclusory statements without further explanation or analysis do not satisfy the requirements of 20 C.F.R. § 1404.1520c. Nor do they build a logical bridge sufficient to allow judicial review. *See Arakas*, 983 F.3d at 110 ("The ALJ's mere conclusory explanation that the medical consultants' opinions were 'generally consistent

---

[41] There is no specific listing for migraines. According to SSA guidance, the most analogous listing for evaluating migraines is 11.02 (epilepsy). *See Snow v. Berryhill*, No. 3:18-cv-434-JD, 2019 WL 1873551, at *3 (N.D. Ind. Apr. 26, 2019). Under Listing 11.02, "a claimant must have a documented history of migraine headaches from an acceptable medical source with the same frequency that a person with epilepsy has seizures," i.e. either "at least once a week for at least 3 consecutive months despite adherence to prescribed treatment" or "at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, as well as a 'marked' limitation in physical functioning, understanding, remembering, or applying, interacting with others, concentrating, persisting, or maintaining pace, or adapting or managing oneself." *Warrior v. Kijakazi*, 583 F. Supp. 3d 1191, 1203 (E.D. Wis. 2022). The ALJ found that "[n]o treating physician or examining physician has indicated diagnostic findings that would satisfy any listed impairment," and also that Plaintiff's impairments, "either separately or in combination, do not meet or medically equal the criteria of any listed impairment" because "[t]he listings have threshold requirements that are not met in the instant case," and because "Dr. Fischer's opinion is detailed, and well supported by the record." [AR 18]. Plaintiff has not challenged these findings. The Court notes, however, that the ALJ's findings are conclusory, and, as such, do not provide an adequate basis for judicial review. *See, e.g., Warrior*, 583 F. Supp. 3d at 1203 (remanding for a new determination of whether Listing 11.02 applied where, "even a cursory review of the record reveals a plethora of evidence showing that [the plaintiff] suffers from chronic, severe, and frequent migraine headaches").

with the other evidence of record' fell far short of [satisfying the] requirement [for providing a narrative discussion of how specific evidence supports the assignment of a certain weight to a medical opinion]."). For instance, the ALJ does not identify the evidence in the record that is consistent with Dr. Fischer's opinion. And the ALJ's statement that Dr. Fischer's opinion was "consistent with *all* the other evidence in the record from *all* other sources" is demonstrably incorrect, since that would include, among other evidence, Plaintiff's testimony as well as the evidence of Plaintiff's functioning abilities provided by Plaintiff's boyfriend, which the ALJ summarily dismissed.[42] It also is a plainly incorrect statement insofar as the ALJ *herself* points out an inconsistency between Dr. Fischer's opinion and the opinion of Plaintiff's treating otolaryngologist, Dr. Ostrowski (discussed in the next section). [AR 22-23].

In any event, the Commissioner's citation to Dr. Fischer's report falters in that "[d]octors' opinions cannot provide the needed logical bridge" for an ALJ's analysis of the claimant's migraine evidence and testimony. *Moon,* 763 F.3d at 722. And Dr. Fisher, like the ALJ, only identifies one cherry-picked medical record—a February 11, 2020 medical note indicating that Plaintiff reported that her headaches were "somewhat manageable with rest, activity modification." [AR 1463]. This single medical record does not accurately reflect the entire course

---

[42] The ALJ said she did not need to discuss the third-party function report completed by Plaintiff's boyfriend because it was "inherently neither valuable nor persuasive in accordance with 20 C.F.R. § 404.1520b(c)." [AR 23 n.1]. Of course, if that were true, then why would the SSA provide third-party function report forms for friends and relatives to complete? There were many statements in the report that did not fall within the category of evidence addressed by 20 C.F.R. § 404.1520b(c), i.e., statements regarding the ultimate issue of whether a claimant is disabled. Moreover, even as to those statements falling in this category of evidence, the regulation does not mean the ALJ is excused from discussing it in this context. *See, e.g., Brenda L.,* 2022 WL 2763561, at *10 ("While the SSA's revised regulation for evaluating medical opinion evidence under 20 C.F.R. §§ 404.1520b and 416.920c purports to absolve the ALJ from providing articulation about [ ] statements [regarding the ultimate issue of whether a claimant is disabled], SSR 16-3p still requires an ALJ to consider [such] statements … when considering a claimant's subjective symptom reports.").

of Plaintiff's treatment history, as previously discussed. Moreover, even considered on its own, this medical record does not support Dr. Fisher's conclusions regarding the effect of Plaintiff's migraines on her RFC. It states that Plaintiff was able to manage *only* "with rest" and "activity modification." Without further development of what "rest" and "activity modification" mean, the medical note in question does not shed any light on Plaintiff's ability to work full-time even with her migraines.

The only additional analysis of Plaintiff's headaches in Dr. Fisher's opinion is the comment that "[c]laimant suffered from headaches for years prior to onset and there did not appear to be any worsening at or around AOD [alleged onset date]." [AR 1463]. The ALJ apparently accepted this analysis uncritically. But, as will be discussed later in this opinion, the ALJ erred in doing so. The Court is unable to discern from Dr. Fischer's written opinion any indication that he considered and weighed the factors outlined in SSR 16-3p to assess Plaintiff's symptom reports concerning her headaches. And in fact, again as will be discussed later in this opinion, he flatly denied doing so.

In sum, a court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal quotation marks and citation omitted). Nevertheless, the ALJ must justify her subjective symptom evaluation "by discussing specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and he "must build a logical bridge from evidence to conclusion." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). An ALJ's evaluation is "patently wrong" and subject to remand when the ALJ's finding "lacks any explanation or support." *Murphy*, 759 F.3d at 816 (citing *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008)). The reasons the ALJ gave for her inconsistency findings are based on faulty logic and an inappropriately limited consideration of the evidence. To the extent that any of the matters listed in SSR 16-3p were explored by the ALJ, that exploration was perfunctory, contained analytical errors such as reliance

on the absence of objective evidence and improper cherry-picking, and lacked a logical bridge between the cited evidence and the ALJ's conclusions. It is certainly possible that Plaintiff's headaches are less severe than she has alleged. *Nowak*, 2021 WL 1263753, at *11. But the ALJ's stated reasons and the evidence she cited do not support that conclusion. Therefore, the ALJ's credibility determination cannot be upheld under the substantial evidence standard.

## USE OF CANE

Plaintiff's second argument is that the ALJ erred in failing to include any limitations regarding the need for a cane or rollator for balance in the RFC and hypothetical questions posed to the VE. As previously noted, the ALJ asked the VE if her testimony would be different for any of the hypotheticals if Plaintiff needed to use a cane for ambulation, and the VE testified no. Plaintiff asserts, however, that "the VE was not asked about the impact that a limitation of needing a cane or rollator for balance from time to time would have on jobs." [DE 14 at 24]. It is true that the ALJ asked the VE about use of an assistive device only for ambulation, not for balance.[43] SSR 96-9p states that, in deciding whether to impose a limitation related to the use of a hand-held assistive device in a claimant's RFC, the ALJ "must always consider the particular facts of a case." SSR 96-9p, 1996 WL 374185, at *7. For example, SSR 96-9p notes that "an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, … may still have the ability to make an adjustment to sedentary work that exists in significant numbers." *Id.* Significantly, however, the regulation goes on to state that, "[o]n the other hand, the occupational

---

[43] *See, e.g., Harriman v. Comm'r of Soc. Sec.*, No. 2:20-cv-6548, 2022 WL 374476, at *1 (S.D. Ohio Feb. 8, 2022) ("The Vocational Expert testified that Plaintiff could still perform jobs at the sedentary or light level even if Plaintiff required the use of a rollator walker to ambulate to and from the workstation. It was only if Plaintiff required a rollator walker to also stand or balance that the non-disability finding *might* change." (emphasis in original; internal citation omitted)).

base for an individual who must use such a device *for balance* because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded." *Id.* (emphasis added). Thus, because the issue may continue to be important on remand, the Court will address Plaintiff's arguments regarding her use of a cane or other assistive device.

The ALJ found that Plaintiff did not need an assistive device because (1) her "symptoms of vertigo were markedly improved following the vestibular neurectomy"; (2) she "has often been noted to have a normal gait and station"; (3) Dr. Fischer "testified that, although a cane may be helpful, it is not medically necessary"; and (4) the assistive device was ordered in March 2019 but "it does not show up in subsequent records." [AR 21]. These reasons for not including an assistive device in Plaintiff's RFC are not supported by substantial evidence.

To begin with, the ALJ's statement that the assistive device does not show in Plaintiff's medical records after March 2019 is incorrect. Plaintiff's use of a cane is noted in medical records on June 10, 2019 [AR 1224], August 16, 2019 [AR 1407], September 10, 2019 [AR 1438], December 12, 2019 [AR 1318], December 23, 2019 [AR 1434], February 11, 2020 [AR 1431], and February 17, 2020 [AR 1425].[44]

In addition, the statement that Plaintiff has often been noted to have normal gait and station may be true, but the ALJ does provide specific pages in the cited records so the Court does not know the dates on which those observations were made. The nurse practitioner ordered a cane or rollator in March 2019, and the cited exhibits include medical records from before then, i.e., when the need for an assistive device might not yet have arisen. Moreover, Dr. Fisher testified that it

---

[44] It is unclear how the ALJ reached the conclusion that the cane "does not show up in subsequent records" when only a few sentences earlier the ALJ cited multiple records after March 2019 when the cane was prescribed for the statement that "the claimant has also sometimes been noted to be walking with cane." [AR 21].

was "chronologically" unimportant to his opinion that a cane was ordered in March 2019 and that medical records around that time might have supported the order. [AR 39]. It does not seem to be logically consistent for the ALJ to rely on both Dr. Fischer's opinion that discounted medical records from March 2019 showing a possible need for a cane, while at the same time also relying on medical records showing a normal gait and station in that same time period. In any event, the ALJ's reliance on normal "station and gait" observations without confronting conflicting evidence in which various medical providers found that Plaintiff had an "antalgic" gait and station[45] [AR 1431, 1434, 1438, 1521] amounts to cherry-picking. It also lacks a logical bridge to cite to normal gait and station to refute Plaintiff's testimony about needing a cane for balance and dizziness issues, as opposed to pain, and, as discussed further below, Plaintiff testified to needing a cane for both reasons.

### A.    BALANCE/DIZZINESS

The ALJ's citation to the observation in Plaintiff's medical records that her symptoms of vertigo were markedly improved following the vestibular neurectomy is both cherry-picking and fails to build a logical bridge. It fails to build a logical bridge because the cane was not prescribed for Plaintiff because of vertigo. Instead, the record shows that Plaintiff was suffering weakness in the legs, balance issues, and dizziness, and she testified that she uses the cane for one or more of these reasons. The ALJ's statement amounts to cherry-picking because the vestibular neurectomy occurred in April 2017, and the comment that Plaintiff's vertigo was "markedly improved" since then was made on May 29, 2018 [AR 410]. A year later, on June 27, 2019, Plaintiff told her new treating otolaryngologist, Dr. Yates, that she had not experienced vertigo since her vestibular

---

[45] An antalgic gait is a disruption in a person's walking pattern that is usually caused by pain. *See https://www.healthline.com/health/antalgic-gait* (last visited September 22, 2022).

neurectomy, but that she trips and falls frequently and suffers from dizziness. Dr. Yates' treatment notes indicate that Plaintiff "has left-sided Meniere's disease *and constant imbalance* due to a combination of Meniere's and history of vestibular neurectomy as well as hx [history] of migraine." [AR 1208].

In addition, Dr. Ostrowski, Plaintiff's former treating otolaryngologist, opined on April 22, 2019, that Plaintiff "only has partial balance function," that Plaintiff has "no balance function from left ear," and that Plaintiff has "permanent balance loss from the left ear due to Meniere's Disease and previous vestibular neurectomy." The ALJ found that Dr. Ostrowski's opinion was not persuasive to the extent that it differed from Dr. Fischer's opinion. But the ALJ said that Dr. Ostrowski's opinion was "not supported by the objective evidence in his own records" without identifying the supposedly inconsistent evidence, let alone explaining the inconsistency. The ALJ also said that Dr. Ostrowski's opinion is not consistent "with all the other evidence in the record from all other sources*,*" when evidence from other sources in fact is consistent with his opinion, including Plaintiff's testimony and Dr. Yates' treatment notes, which state that Plaintiff has "constant imbalance."

Next, the ALJ mischaracterized Dr. Ostrowski's opinion as stating that Plaintiff had "no balance function," when Dr. Ostrowski actually stated that Plaintiff had no balance function *in the left ear.* The ALJ also stated that, unlike Dr. Ostrowski, Dr. Fischer "had the benefit of reviewing the entire record," without identifying the evidence in the "entire record" that is inconsistent with Plaintiff's reported dizziness and sense of unbalance and Dr. Ostrowski's opinion. The ALJ stated that, "as Dr. Fischer pointed out, there is no objective evidence of balance issues in the record." This reference is likely to Dr. Fischer's testimony at the supplemental hearing that he "did not see a lot of objective evidence where [Plaintiff] was at various office visits having trouble with her balance." [AR 43]. But neither the ALJ nor Dr. Fischer cite to Plaintiff's medical records or explain

what kind of "objective evidence" they had in mind. Dr. Fischer's written opinion also is conclusory, asserting that Plaintiff did not satisfy Listing 2.07 because she "does not have frequent attacks of balance disturbance and other symptoms mentioned in" that listing. [AR 1463]. The opinion does not explain the basis for that conclusion.

Listing 2.07 states as follows:

> 2.07. Disturbance of labyrinthine-vestibular function (Including Meniere's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:
>
> A.  Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and
>
> B.  Hearing loss established by audiometry.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 2.07.  Plaintiff does have hearing loss in her left ear, and there appears to be some evidence in the record that speaks to whether Plaintiff has a disturbed vestibular function as shown by vestibular testing. *See* [AR 70]. At the supplemental hearing, Dr. Fischer acknowledged that a positive Romberg test would be an indication of someone who might "have some difficulty with their balance," and that he did not "specifically recall" whether the record contained such evidence. [AR 40-41]. Thus, it appears that Dr. Fischer did not consider evidence in the record indicating that Plaintiff might have satisfied paragraphs A and B of Listing 2.07.

Dr. Fischer's conclusion that Plaintiff did not suffer frequent attacks of balance disturbance was the asserted basis of his opinion that an assistive device was not medically necessary, yet neither his written opinion or his testimony at the supplemental hearing adequately explains that conclusion. Indeed, Dr. Fischer testified at the supplemental hearing that he was "not necessarily" disagreeing with Dr. Ostrowski's statement that Plaintiff had permanent balance loss. [AR 44]. He pointed out, however, that he and Dr. Ostrowski both limited Plaintiff's RFC to rule out any jobs

that required balancing (the ALJ also adopted that limitation). But Dr. Fisher did not explain why that limitation was sufficient to account for Plaintiff's balance issues. Because neither the ALJ nor Dr. Fischer explained the finding of a lack of objective evidence regarding frequent attacks of balance disturbance as a basis for concluding that it was sufficient for Plaintiff's RFC to preclude jobs requiring balancing without any requirement of an assistive device, the Court cannot perform its function of judicial review and thus cannot say that the RFC finding is supported by substantial evidence.

### B.   LOWER EXTREMITY PAIN

Dr. Fischer's opinion that an assistive device was not medically necessary was mostly based on his assessment that Plaintiff "did not have any low back spinal condition or specific leg weakness that required her to use a cane or rollator." [AR 39]. As to this issue, Plaintiff points out that her medical records include several items that are inconsistent with Dr. Fischer's assessment of Plaintiff's lower back spinal condition.

For instance, examinations by the neurology nurse practitioner on August 21, 2018 and September 17, 2018 showed weakness in Plaintiff's bilateral upper and lower extremities. [AR 1015, 1018]. In addition, Plaintiff reported myalgia (muscle aches and pain) and muscle weakness, as well as balance issues, and further complained about numbness and tingling in the upper and lower extremities. [AR 1015, 1018, 1019]. These symptoms continued, and an examination by Plaintiff's neurologist, Dr. Du, on March 7, 2019, showed lower extremity weakness. [AR 1193]. Plaintiff also reported at that time that she was experiencing numbness and weakness in the bilateral extremities, and that she was unable to stand up for more than two minutes before her legs began to feel weak. [AR 1192]. She said that she was unable to hold her grandson while standing out of fear of falling. Her legs felt heavy, and she worried they would buckle under her weight. She also reported that she has to sit in the shower because she is unable to stand long

enough to cleanse herself, and that she also experiences intermittent numbness bilaterally in her fingers and hands. [AR 1192]. Based on Plaintiff's reports and his examination findings, Dr. Du ordered a nerve conduction study (NCS) and an electromyography (EMG). [AR 1193-1194]. That testing was done on March 11, 2019, and showed mild but chronic L4 (lumbar) and C6/7 (cervical) radiculopathy. [AR 1148].

Dr. Fischer's report makes note of the C6/7 finding but not the L4 finding in the same medical record. This omission may explain why Dr. Fischer opined only as to possible mild upper extremity limitations and concluded that Plaintiff did not have any low back spinal condition or specific leg weakness[46]. Given that Dr. Fischer does not acknowledge the L4 finding in his report, the Court cannot say that his assessment of Plaintiff's lower back spinal condition is supported by substantial evidence. The Commissioner argues that "Dr. Fischer stated that he reviewed the evidence, including the medical records in question, and thus it must be assumed he took those records into consideration in forming his opinion. [DE 15 at 7]. The Commissioner also points to Dr. Fischer's testimony at the hearing in October 2020, in which, after noting that the EMG findings and the nurse practitioner's order for a cane or rollator were from March 2019, Dr. Fischer stated that he "didn't see any medical records that showed that [an assistive] device was necessary chronologically." [AR 39]. The Court's review, however, is of the ALJ's decision, not Dr. Fischer's opinion, and the ALJ's decision does not explain why Dr. Fischer's opinion is supported by and consistent with the evidence in the record. The ALJ must consider the

---

[46] Cervical radiculopathy can cause pain and other symptoms in and around the neck that can radiate to the arms and hands, while lumbar radiculopathy can cause pain or numbness in the lower back that can spread to the legs. *See https://my.clevelandclinic.org/health/diseases/22564-radiculopathy#diagnosis-and-tests* (last visited 9/22/2022).

supportability and consistency factors before relying on Dr. Fischer's opinion. *See* 20 C.F.R. § 404.1520c(b)(2), (c)(1), (c)(2).

The Commissioner also implies that the ALJ had no obligation to address the evidence regarding Plaintiff's need for an assistive device because, in order to find such a device "medically required" for a claimant limited to sedentary work, "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96–9p, 1996 WL 374185, at *7. The Commissioner does not explain why the prescription for a cane or rollator for bilateral "numbness/weakness" in the record does not satisfy the medical documentation requirement. Moreover, Dr. Fisher testified that he did not find it unreasonable for Plaintiff to use a cane or rollator from time to time due to balance and dizziness issues. [AR 44]. "The error in this case … is not that the medical evidence required the ALJ to find that [Plaintiff] needed a cane to stand and walk, but that the ALJ failed to [adequately explain her decision], leaving [the Court] without a finding to review. [The Court] cannot uphold the ALJ's decision based on a reason that the ALJ did not articulate." *Thomas v. Colvin*, 534 F. App'x 546, 550 (7th Cir. 2013).

The Court does not know whether Dr. Fischer simply overlooked the L4 (lumbar) finding or, if he did, whether, it would change his opinion about the medical necessity for an assistive device. The Court also does not know whether a different opinion would relate solely to using an assistive device for ambulation or whether it would involve use for balance as well. Because the ALJ did not discuss those factors in connection with her citation to Dr. Fischer's opinion, the Court is unable to conduct a substantial evidence review of the ALJ's reliance on that opinion. Simply declaring that Plaintiff's testimony about needing a cane or rollator to balance was inconsistent with "all the other evidence in the record from all other sources" and that Dr. Fischer's opinion "is more persuasive than the opinion of Dr. Ostrowski" without explaining either conclusion does not

satisfy the ALJ's obligation to build a logical bridge between the evidence and the ALJ's conclusions. Upon remand, the ALJ should set forth her finding regarding Plaintiff's use of an assistive device with particularity so that judicial review of that finding is possible.

## OFF-TASK OR ABSENTEEISM

While the ALJ's RFC analysis suffers from numerous flaws as discussed above, arguably the ALJ arrived at an RFC that does account in multiple respects for Plaintiff's limitations from headaches, neck pain, and dizziness: the ALJ limited Plaintiff's RFC to sedentary work, with the additional restrictions of no more than 30 minutes of standing or walking at one time. In addition, she provided that Plaintiff never be required to balance. For this reason, perhaps Plaintiff's strongest argument is her final one—the ALJ erred in failing to include any limitations in the RFC related to being off-task or absenteeism.

Plaintiff cites to evidence in the record supporting her testimony that, even with her current migraine medication, she is still suffering from about 10 migraines per month where she would experience pain at a level of about 6 out of 10, and that when they occur, she has to lay down in a dark room. When she experiences these migraines, she also sees colored spots and blurred vision, and gets dizzy. In addition, she suffers bouts of dizziness lasting two minutes each and occurring two to three times per hour. And, she continues to experience tinnitus in the left ear from her Meniere's disease, which sometimes hit levels where she "can't even leave the house" because it makes her nauseas. [AR 90]. The tinnitus at that level happens multiple times a week and can last for days. [AR 91]. On July 23, 2020 (which was between the dates of the original and supplemental hearings), Plaintiff saw her primary care physician complaining of a fibromyalgia flare up for which she spent ten days in bed. [AR 1482]. In addition to the fibromyalgia pain (which, for the first time was in her hands), Plaintiff also complained of horrible anxiety and pounding headaches every morning. [*Id.*]. Dr. Fischer, testified that it would not be unusual for a person to be unable

to concentrate or focus on a task if that person is suffering from a five- to six-hour long migraine headache, which required her to be in a dark room. He also admitted that it would not be unreasonable for the same person to miss work on days when she suffered from such a headache.[47] The VE testified that if a person was off-task fifteen percent of the workday, or missed one or more days of work per month, that person could not sustain full-time work. [AR 57-58]. If Plaintiff's testimony that she experiences severe headaches at least ten times per month with symptoms of blurry vision, seeing colored spots and dizziness is credited, then this testimony "is potentially decisive given the vocational expert's testimony that an individual cannot miss more than one day of work per month or be off task more than [15]% of the work day." *Christina B.,* 2022 WL 178606, at *11.

According to the Commissioner, "off-task[] accommodations or absences were not evident based on [the] ALJ's review of the overall record." [DE 15 at 8]. This appears to be the Commissioner's after-the-fact explanation for the ALJ's failure to include an off-task or absences limitation in the RFC as there is no discussion of the issue in the ALJ's decision, even though the evidence and testimony before the ALJ (including, among other things, Plaintiff's counsel's questioning of the VE) clearly raised the issue. *See Kastner v. Astrue,* 697 F.3d 642, 648 (7th Cir. 2012) ("Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace."). The Commissioner also notes that Dr. Fischer testified that he was not providing an opinion or assessing whether Plaintiff actually had the number of migraines she claimed to have in a given week or month. [AR 47]. Nor did he provide an opinion as to the pain level Plaintiff experienced prior to taking medication versus after

---

[47] Although the question was awkwardly framed as a double negative, the Court disagrees with the Commissioner's contention that Dr. Fischer did not testify to this effect.

medication for migraines. [*Id.*]. But that testimony actually cuts against the ALJ's decision. The ALJ relied heavily on Dr. Fischer's opinion in determining Plaintiff's RFC, yet Dr. Fischer admitted that his RFC opinion did *not take into account* how frequently Plaintiff suffered headaches and what level severity they were even with medication.[48] Instead, his RFC assessment assumed that Plaintiff's migraines would not interfere with her ability to work, and—this is the crucial part—the *reason* he assumed this is because "claimant suffered from headaches for years prior to onset and there did not appear to be any worsening of symptoms at or around AOD." [AR 1463; *see also* AR 46 ("[T]he history of migraines … go way back years and years. And she obviously worked before onset with migraines.")].

As previously noted, "doctors' opinions cannot provide the logical bridge" that is required for an ALJ's analysis of the claimant's migraine evidence and testimony. *Moon,* 763 F.3d at 722. Here, as in *Moon*, Dr. Fischer "did not address the possibility that a migraine could keep [Plaintiff] home in bed," apparently understanding [Plaintiff's] 'history of migraines' to have implications only for her ability to [work with excessive noise levels]." *Id.*; *see* [AR 46 ("I accounted for them [by a limitation about being "around real loud noises … and only occasional vibrations, which might trigger migraine")]. Insofar as any further limitation from migraines was concerned, Dr. Fischer mentioned only that Plaintiff "takes narcotics for migraines," and that "she obviously worked before onset with migraines." [AR 46]. But Plaintiff's testimony was that even with medication, she suffered about 10 migraines a month. And insofar as her past work history is concerned, neither Dr. Fischer nor the ALJ, who relied on Dr. Fischer's RFC opinion, established

---

[48] *See* [AR 42 (**Q:** … [W]ould it be fair to say that .. your review of the medical records as they pertain to migraine really didn't come into play when you … were making a statement about the claimant's ability to [do] work-related activities, physical activities? **A.** Yes.); AR 46 ("**Q:** … [A]m I correct in understanding that you thought [migraines] did not come into play very much [in fashioning the RFC limitations]? **A:** Correct, yes.")].

a logical bridge to connect that work history with an ability to perform full-time work. To build a logical bridge, there would have to be a discussion of at least three issues:

(1)    *Whether Plaintiff's migraine situation had gotten worse around the onset date, whether in terms of frequency, severity, or, medication control*. Any assumption made by the ALJ, whether directly or indirectly, about the "fact that [Plaintiff's] migraines began long before [she] stopped working … [must] come to grips with [the evidence in the record about whether] her headaches had become worse in recent years." *Moon*, 763 F.3d at 722; *see also Hill v. Colvin*, 807 F.3d 862, 868–69 (7th Cir. 2015) ("The Commissioner counters that consideration of a claimant's work history is proper when the claimant has had essentially the same condition for decades, and remained able to work. That statement is true enough, but [the plaintiff] has never asserted that the severity of her impairments have remained the same for decades." (internal quotation marks and citations omitted)).

Plaintiff testified that her migraines increased after she had the vestibular neurectomy. [AR 49]. There are also indications in the record that Plaintiff may have no longer had a rescue medication she could rely on to work in those times when a severe migraine occurred, so that, even if the number and average severity of her migraines had decreased, more than one severe migraine that did not respond to any rescue treatment could result in Plaintiff having to miss work. *See Moore*, 743 F.3d at 1126 (if the ALJ's conclusion was that missed work days would not be problematic because the plaintiff would still have the rest of the month without such symptoms, that rationale would "essentially ignore the inability to schedule the incapacitating migraines. Absent a showing that [the plaintiff] has a completely flexible work schedule, ... the existence of symptom-free days adds nothing").

(2)    *Whether Plaintiff was suffering increased pain symptoms in other parts of her body, such as her neck, which she had not been dealing with prior to the onset date*. There is no indication

in the ALJ's decision or Dr. Fischer's opinion that the combined effects of Plaintiff's chronic pain from differing sources was evaluated. The ALJ's decision states that the ALJ considered all medically determinable impairments, in combination, when assessing Plaintiff's RFC [AR18].[49] But her discussion of Plaintiff's symptoms does not reflect such consideration was actually given. *See Clifford*, 227 F.3d at 873 ("Because the record does not indicate that the ALJ properly considered the aggregate effect of all [the plaintiff's] ailments, we believe a redetermination of a multiple impairments analysis is necessary."); *Sarchet*, 78 F.3d at 309 ("The case could easily have gone the other way, especially if the cumulative effect of [the plaintiff's] substantiated ailments is considered, as the law permits."); *Fields,* 213 F. Supp. 3d at 1074 ("[T]he ALJ's RFC analysis does not give this Court confidence that she gave appropriate consideration to the combined effects of Plaintiff's impairments."); *Morreale*, 595 F. Supp. at 911 ("Even if the ALJ did not err in discounting plaintiff's claim of disabling dizziness, the ALJ erred in failing to consider the combined effects of his impairments.").

(3)     *Whether Plaintiff was only able to continue working prior to the onset date because of accommodations made by her employer*. The record is noticeably undeveloped with regard to how frequently Plaintiff was absent from work prior to the onset date, and/or the reasons why she stopped working when she did.[50] These issues should have been explored before any conclusion was drawn about why Plaintiff could work prior to the onset date but not afterwards. *See Clifford,* 227 F.3d at 873 (the ALJ must adequately develop the record if the evidence is insufficient to make

---

[49] This statement was made in relation to the ALJ's finding at step 3 that Plaintiff's impairments of pseudo tumor cerebri syndrome and Hashimoto Thyroiditis were non-severe impairments, citing in support an "unremarkable" brain MRI and the fact that Plaintiff does not allege disability due to obesity. [AR 18].

[50] *See* [AR 1449 (plaintiff reports quitting her job because she was about to lose it for excessive absences due to her medical problems).

a decision). Indeed, the Seventh Circuit has said that, although "[a]n ALJ is not statutorily required to consider a claimant's work history, … 'a "claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability'" *Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016) (quoting *Hill*, 807 F.3d at 868 (quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983))). Thus, "in assessing [Plaintiff's] credibility about the disabling effects of her pain, the ALJ should have acknowledged [Plaintiff's] efforts to continue work while experiencing significant pain and undergoing numerous … treatments to relieve it." *Id.*[51]

The Court does not find reversible error simply because the ALJ did not mention Plaintiff's work history. *See Summers v. Berryhill*, 864 F.3d 523, 528-29 (7th Cir. 2017) ("The ALJ did not commit reversible error by failing to explicitly discuss [the plaintiff's] work history when evaluating her credibility."). Instead, the error here was to rely uncritically on Dr. Fischer's opinion, which relies on an improper assumption. "A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working." *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005); *see also Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003) ("[T]he fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation.").

The ALJ's reliance on Dr. Fischer's opinion concerning the effect of Plaintiff's headaches on her ability to work, as argued by the Commissioner, did not build a logical bridge because

---

[51] *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) ("[A] claimant's dogged efforts to work beyond her physical capacity would seem to be highly relevant in deciding her credibility and determining whether she is trying to obtain government benefits by exaggerating her pain symptoms."); *Flores v. Massanari*, 19 F. App'x 393, 404 (7th Cir. 2001) ("[T]he ALJ failed to even acknowledge Flores's solid work history; Flores had been employed each year for the thirteen years before his illness."); *Fields*, 213 F. Supp. 3d at 1073 ("[T]he ALJ failed to consider Plaintiff's long work history as a factor supporting her credibility.").

neither Dr. Fischer nor the ALJ addressed this issue. *See Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir. 2011) (finding the ALJ failed to build a logical bridge between plaintiff's activities and his conclusion that she did not meet a listing when he failed to ask the critical questions about plaintiff's actual work hours or absentee rates in the jobs she held); *Rucker v. Berryhill*, No. 17 C 5420, 2018 WL 4110740, at *3–4 (N.D. Ill. Aug. 29, 2018) (holding that ALJ failed to build a logical bridge when he "simply stated that Plaintiff's history of working 30 to 40 hours a week for eight months … was inconsistent with the limitation levels Plaintiff alleged," but did not "inquire into Plaintiff's absentee rates, need for breaks, or challenges Plaintiff faced while working"); *Wilson v. Berryhill*, No. 3:17-CV-253 RLM-MGG, 2018 WL 1174269, at *2 (N.D. Ind. Mar. 5, 2018) ("The ALJ relied on [the plaintiff's] full-time employment at Walmart in early 2014 to discount her complaints of depression and anxiety, but didn't address the Walmart records that shows that [the plaintiff] didn't show up for work, was absent without authorization, or didn't complete her shift 19 times during her five months of work at Walmart, an average of almost four times per month.").

### MENTAL RFC

In light of the fact that this case must be remanded for the reasons already discussed, the Court takes this opportunity to address one final issue that strikes the Court as something that should be explored on remand—the ALJ's mental RFC.

The ALJ's treatment of Plaintiff's mental RFC is lacking in a number of respects. The ALJ acknowledged that Plaintiff has a history of depression and anxiety and was hospitalized with suicidal ideation in July of 2018. The ALJ also cited medical records showing that Plaintiff was seen with "an anxious, depressed, and/or dysthymic mood," and that she "has also occasionally displayed restlessness, trembling, and/or tearfulness." However, the ALJ cited numerous records that purportedly show that Plaintiff "has routinely had a normal or appropriate mood and affect,"

and "has also displayed normal interaction and behavior[;] … has often been cooperative[;] … has also demonstrated normal judgment and thought content[;] … [and] has had a logical thought process." [AR 21]. The ALJ further cited records purportedly demonstrating that Plaintiff's "memory has … been at least okay," that she "display[s] normal comprehension," that she "has no problems getting along with others," that she "can also go out alone and shop in stores" and further "spends time with others," that she "is able to drive a car short distances" and has "frequently displayed good attention and concentration." [AR 18]. Without getting into a more detailed discussion (since the issue was not briefed), this analysis of Plaintiff's mental RFC suffers from the same logical bridge and cherry-picking problems previously discussed with respect to the ALJ's analysis of Plaintiff's physical RFC.

Furthermore, to the extent that the ALJ relied on the findings of the state agency psychological consultants [AR 22], those findings did not take into account later development in the record of evidence concerning Plaintiff's depression and anxiety. There is no indication that the state agency reviewers considered the effect that Plaintiff's pain and years of battling various physical impairments had on her mental functioning, an issue that is explored in Plaintiff's treatment records only after their review. "The ALJ should have developed the record regarding Plaintiff's mental impairments and further evaluated her concentration, persistence, and pace restrictions, particularly considering her long-standing diagnos[e]s of [fibromyalgia, chronic intractable migraines, and Meniere's disease], the strong prescription pain medications she ha[s] taken for years, the prescription of anti-depressant and anti-anxiety medications, and evidence of more than minimal limitations with concentration, persistence, or pace confirmed in the record." *Brenda L.,* 2022 WL 2763561, at *6 (citing *Murphy*, 496 F.3d at 634 (stating an ALJ has a duty to develop the record before drawing any conclusions, citing 20 C.F.R. § 416.912(d))).

There also appears to be a problem with even the ALJ's current mental RFC findings. The ALJ found that Plaintiff had a moderate limitation in concentration, persistence or maintaining pace, but the RFC finding does not account for that moderate limitation. The ALJ stated that she accounted for that moderate limitation "by finding [Plaintiff] is able to understand, remember, and carry out work that consists of detailed, but not complex tasks." [AR 21-22]. The ALJ's RFC restriction to detailed but not complex tasks, however, relates to "the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). The ALJ's moderate limitation finding, on the other hand, relates to "[t]he ability to stick with a given task over a sustained period." *Id.* These are "*not* the same" things. *Id.* (emphasis added). The SSA recognizes that pain may affect an individual's ability to meet non-exertional demands of work including, *e.g.,* concentration. *See* Program Operations Manual System (POMS) DI 24510.006. The ALJ's "failure to account for any concentration, persistence, and pace deficits in the RFC and the need for breaks due to chronic pain [ ] and the combination of Plaintiff's impairments was an error." *Brenda L.*, 2022 WL 2763561, at *7.

## **CONCLUSION**

For the foregoing reasons, the Commissioner's final decision is **REVERSED AND REMANDED** for further proceedings. The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Plaintiff and against Defendant.

ORDERED this 29th day of September, 2022.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT